RSR CORPORATION, Petitioner,

v.

Raymond J. DONOVAN, Secretary of Labor, and Occupational Safety and Health Review Commission, Respondents.

No. 81–4379.

United States Court of Appeals, Fifth Circuit.

Nov. 26, 1984.

Michael J. Cozzillio, Alan J. Statman, Washington, D.C., for petitioner.

T. Timothy Ryan, Jr., Sol., Benjamin Mintz, Judith N. Macaluso, Allen H. Feldman, Attys., Laura V. Fargas, Dept. of Labor, Ray H. Darling, Jr., Executive Secretary, Edward G. Hoban, Earl R. Ohman, Jr., Attys., Washington, D.C., for respondent.

Mary Win-O'Brien, United Steelworkers of America, Pittsburgh, Pa., Peter O. Shinevar, Washington, D.C., for United Steelworkers of America.

Before BROWN, TATE and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

RSR Corporation appeals a final order of the Occupational Safety and Health Review Commission, pursuant to section 11(a) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660(a). RSR challenges the Commission's finding of a serious violation, 29 U.S.C. § 666(j), of the standards set forth in 29 C.F.R. § 1910.1025(f)(2)(i) and 29 U.S.C. § 654(a)(2) [1] for failure to select and require its employees to wear appropriate protective respirators in accordance with Table II of the Act's lead standard, 29 C.F.R. § 1910.1025. Though RSR argues that its violation of the lead standard was not a "serious" one within the meaning of the Act, the gist of its defense is an attack on the substantive validity of the lead standard itself. RSR seeks to contest the validity of the Table II respirator standards in this section 11(a) review of an OSHA enforcement proceeding, 29 U.S.C. § 660(a), after participating in the promulgation, 29 U.S.C. § 655(b), and pre-enforcement judicial review, 29 U.S.C. § 655(f), of the lead standard. We hold that RSR, aware of both its violation and present complaint at the time of its earlier challenge to the lead standard, is now barred from mounting this attack on the respirator regulation's validity. As its other contentions are without merit, we affirm the Commission's order.

I

RSR is a secondary lead refiner. It has a wholly owned subsidiary in Dallas, Texas, whose operations include battery wrecking.[2] To guard against exposure to resulting airborne lead contaminants, RSR supplied its battery wrecker employees with

---

1. Section 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., requires employers to comply with the occupational safety and health standards promulgated by the Secretary of Labor. 29 U.S.C. § 654(a)(2).

2. This process involves breaking down old battery cases to reclaim usable lead. Eighteen to twenty workers are employed in the battery wrecker division of the Dallas plant.

half-mask respirators. In August and September of 1979, a compliance officer of the Occupational Safety and Health Administration inspected this Dallas plant, including the battery wrecker department. As a result of this inspection and airborne lead concentration tests, OSHA issued a citation and notification of proposed penalties alleging that RSR had committed a serious violation of 29 C.F.R. § 1910.1025(f)(2)(i) for failure to select appropriate respirators from Table II of 29 C.F.R. 1910.1025(f)(2)(i) (Table II).

Under OSHA's lead standard, 29 C.F.R. 1910.1025, RSR is obligated to reduce its employees' exposure to airborne lead to fifty micrograms of lead per cubic meter of air, 50 ug/m³ [3] averaged over an eight hour period.[4] When engineering and work practice controls are inadequate to reduce the lead contamination to or below this permissible exposure limit, PEL, respirators must be employed.[5] Table II of 29 C.F.R.

§ 1910.1025(f)(2)(i) lists the generic types of respirators that must be employed at various levels of airborne lead contamination.[6] When the proper respirator is worn, it reduces employee exposure to lead by a designated "protection factor." The protection factors assigned the respirators specified in Table II are based on the least effective member of each genre of respirator. In August of 1978, RSR supplied its battery wrecker employees with the 9910 paper half-mask respirator, manufactured by the Minnesota Mining and Manufacturing Company (3M).[7]

The OSHA airborne lead tests at the battery wrecker division indicated that employee exposure to airborne lead well exceeded the maximum PEL for which the 3M 9910 was rated in Table II.[8] RSR's own environmental monitoring from February to November 1979 found contamination levels again well exceeding the permissible exposure limit.[9] Blood lead sampling, also

3. Ambient lead concentrations are measured in terms of micrograms of lead per cubic meter of air. (ug/m³).

4. 29 C.F.R. § 1910.1025(c)(1).

5. *Id.* § 1910.1025(e)(2).

6. 29 C.F.R. § 1910.1025(f)(2)(i) provides that: [w]here respirators are required under this section the employer shall select the appropriate respirator or combination of respirators from table II below.

#### TABLE II—RESPIRATORY PROTECTION FOR LEAD AEROSOLS

| Airborne concentration of lead or condition of use | Required respirator |
| --- | --- |
| Not in excess of 0.5 mg/m³ (10xPEL). | Half mask, air-purifying respirator equipped with high efficiency filters. |
| Not in excess of 2.5 mg/m³ (50xPEL). | Full facepiece, air-purifying respirator with high efficiency filters. |
| Not in excess of 50 mg/m³ (1000xPEL). | (1) Any powered, air-purifying respirator with high efficiency filters; or (2) Half-mask supplied-air respirator operated in positive-pressure mode. |
| Not in excess of 100 mg/m³ (2000xPEL). | Supplied-air respirators with full face-piece, hood, helmet, or suit, operated in positive pressure mode. |
| Airborne concentration of lead or condition of use—Continued | Required respirator—Continued |
| Greater than 100 mg/m³, unknown concentration or fire fighting. | Full facepiece, self-contained breathing apparatus operated in positive-pressure mode. |

(Footnotes omitted).

7. Though the respirator selection table does not, on its face, permit the use of a 3M 9910 respirator, the Secretary granted an administrative stay to permit its use within the class of half-mask respirators. 44 Fed.Reg. 5446 (Jan. 26, 1979).

8. Table II assigns half-mask respirators a protection factor of 10, meaning they may be used to protect against a maximum of 10 times the 50 ug/m³ PEL. Full facepiece respirators are therefore required for exposure levels exceeding this 500 ug/m³ level. The OSHA inspection revealed ambient lead levels of up to 11,750 ug/m³ on the day of the inspection, exceeding the PEL by a factor of 235.

9. Employers subject to the Act are required to conduct regular environmental exposure monitoring pursuant to 29 C.F.R. § 1910.1025(d). RSR's own monitoring at the time its battery wrecker employees were outfitted with the 9910 respirator detected ambient leads up to 31,856 ug/m³, more than 600 times the PEL and but one-sixtieth the worker protection mandated by Table II.

conducted as part of RSR's monitoring program, revealed that a majority of the battery wrecker employees had blood leads in excess of known toxic levels.[10] The inspection found no other deficiencies in RSR's lead protection practices and the OSHA inspector concluded that the employees' elevated blood levels could thus only be attributed to the use of deficient respirators.[11]

OSHA then issued a citation and notification of proposed penalties, alleging that RSR had committed a serious violation of the airborne lead contaminant standard in that it did not select the appropriate respirator from Table II. RSR contested the citation. A hearing was held before a Commission administrative law judge at which RSR conceded its technical violation of the standard, but expressed its belief that the 9910 half-mask respirator provided adequate protection for the battery wrecker

workers. It based this belief on actual protection tests performed by the respirator's manufacturer and by RSR itself after the OSHA inspection.[12] The ALJ found the "on-the-spot inspection results ... entitled to considerably more weight than the after-the-fact test results" and concluded that RSR committed a serious violation of the standard in "view of the known injurious effects of overexposure to airborne lead."

RSR also challenged the substantive validity of the respirator regulations, contending that wearer acceptance was not considered in the promulgation of Table II [13], and that the Table's guidelines were based on protection factors derived from the least effective respirator in a particular class.[14] The ALJ found that wearer acceptance was considered in devising the standard and that the Table was therefore validly promulgated.[15] On June 17, 1981, the

---

**10.** RSR was statutorily required to biologically monitor its employees and conduct periodic blood lead sampling. 29 C.F.R. § 1910.-1025(j)(2). The ALJ found that while normal human blood leads are 20 micrograms per 100 grams of blood or less (20 ug/100g), over 60% of RSR's battery wrecker employees had blood leads exceeding 50 ug/100g. He also found that lead manifests its toxic effects on the body at blood levels of 40 ug/100g. RSR failed to notify these employees of the extent of their blood lead contamination as required by 29 C.F.R. § 1910.1025(j)(2)(iv) (employer required to timely notify employees of blood lead results in excess of 40 ug/100g), and received a second uncontested citation for this violation.

**11.** The OSHA inspector found no fault with the plant's work practice controls after his examination of RSR's housekeeping procedures, hygiene facilities (showers and changing rooms), lunchroom area, and control of employee smoking practices. *See* 29 C.F.R. § 1910.1025(g) (protective work clothing and equipment).

**12.** Although the lead regulations require employers to conduct quantitative fit tests to confirm that the respirator selected for a given employee provides at least the minimum protection outlined in Table II, 29 C.F.R. § 1910.-1025(f)(3), RSR apparently failed to conduct such testing until after the OSHA citations. While RSR's after-the-fact quantitative fit tests yielded protection factors of 11 and above, and 3M's test data showed protection factors in excess of 30, quantitative fit testing only approximates actual protection as it is conducted in a controlled environment and involves standard-

ized movements not necessarily replicating actual working conditions. An employer is therefore required to allow a twenty percent margin for inaccuracy in his monitoring results. 29 C.F.R. § 1910.1025(d)(9). RSR's own expert testified that no half-mask respirator should be accorded a protection factor greater than 100, i.e., for exposure levels in excess of 5,000 ug/m³.

**13.** RSR contended that the 3M half-mask afforded greater comfort and communicative ability than the full facepiece respirator required by Table II, increasing wearing time and providing greater protection.

**14.** A more reasonable standard, it suggests, would be one based on individual quantitative fit testing and an employer's subjective judgment regarding the actual protection provided by a particular respirator model. RSR apparently failed to meet even this proposed standard, however, as no such quantitative fit testing was ever performed before selecting the 3M 9910 respirator for the battery wrecker employees.

**15.** The ALJ cited the lead regulation's quantitative fit test requirement, 29 C.F.R. § 1910.-1025(f)(3), and the 4.4 hour a day limitation on wearing time, 29 C.F.R. § 1910.1025(f)(1)(i), in concluding that "wearer acceptance ... necessarily had to be considered when the standard was devised." We note, in addition, that the preamble to the respiratory protection regulation indicates the Secretary carefully considered evidence of wearer acceptance and the prob-

ALJ affirmed the citation and assessed a monetary penalty. The Commission declined RSR's petition for discretionary review and the ALJ's decision became final by operation of law. 29 U.S.C. § 661(i). RSR now appeals. 29 U.S.C. § 660(a).

## II

RSR admits it "technically" violated OSHA's lead standard in providing its battery wrecker employees with respirators inappropriate under Table II for the air lead measured at its Dallas plant, 29 C.F.R. § 1910.1025(f)(2)(i). It argues, however, that the Secretary's failure to consider either actual protection factors or wearer acceptance in promulgating the lead standard, rendered the regulation unreasonable and inconsistent with the Act.

The OSHA lead standard, 29 C.F.R. § 1910.1025, was promulgated under the elaborate rulemaking procedures outlined in section 6(b) of the Act, 29 U.S.C. § 655(b). Section 6(b) affords due process safeguards to persons potentially aggriev-

ed by an OSHA regulation by notifying them and providing them an opportunity to comment or object to a proposed standard.[16] Though RSR launched a substantive challenge to Table II for the first time in this section 11(a) review of an enforcement proceeding, 29 U.S.C. § 660(a),[17] it is no stranger to the OSHA lead standard. RSR directly and as a member of industry and trade associations joined in the notice and comment proceedings surrounding the promulgation of the proposed lead regulation.[18] It also participated extensively in the protracted pre-enforcement judicial review of the lead regulation after it issued in November of 1978.[19] Pursuant to section 6(f) of the Act, 29 C.F.R. § 655(f), RSR petitioned for review of the standard in both the Fifth and Second Circuits.[20] These petitions and others were consolidated and transferred to the District of Columbia Circuit. *United Steelworkers of America, AFL–CIO–CLC v. Marshall*, 647 F.2d 1189 (D.C.Cir.), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). In a

lems, detailed by RSR, commonly associated with workplace respirators, in adopting Table II. 43 Fed.Reg. 52,992 (1978).

**16.** 29 U.S.C. § 655(b) details the procedures the Secretary must follow in promulgating, modifying, or revoking, any occupational safety and health standard. Such procedures include possible recommendations from an OSHA advisory committee, § (b)(1); publication of the proposed rule in the Federal Register, § (b)(2); and affording interested parties a chance to comment, *Id.;* file written objections, and request public hearings thereon, § (b)(3).

The Secretary must comply with additional requirements in promulgating standards dealing with "toxic materials or harmful physical agents" such as airborne lead. 29 U.S.C. § 655(b)(5). Section 6(b)(5) requires, for example, that the Secretary base toxic standards on the "best available evidence" including "research, demonstrations, experiments, and such other information as may be appropriate." He is also directed to consider "the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws"; and express the standard "in terms of objective criteria and of the performance desired." *Id.; see Industrial Union Department, AFL–CIO v. American Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (findings necessary to sup-

port Secretary's promulgation of toxic substance regulation).

**17.** 29 U.S.C. § 660(a) provides in part:

Any person adversely affected or aggrieved by an order of the Commission issued under subsection (c) of section 659 of this title may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or where the employer has its principal office, or in the Court of Appeals for the District of Columbia Circuit, by filing in such court within sixty days following the issuance of such order a written petition praying that the order be modified or set aside.

**18.** OSHA gave the required notice of this proposed rulemaking in 1975, "Occupational Exposure to Lead: Proposed Rulemaking," 40 Fed. Reg. 45933 (Oct. 3, 1975).

**19.** 43 Fed.Reg. 52952, 53007 (Nov. 14, 1978).

**20.** *RSR Corp. v. OSHA*, No. 79–1089 (5th Cir., petition for review filed Jan. 10, 1979) (transferred to D.C.Cir., No. 79–1146, Feb. 2, 1979); *National Association of Recycling Industries, Inland Metals Refinery Co. Inc., Keystone Resources Corporation, and RSR Corporation v. Secretary of Labor,* No. 79–4011 (2d Cir., petition for review filed Jan. 12, 1979) (transferred to D.C.Cir., No. 79–1111, Feb. 13, 1979).

lengthy opinion, the *United Steelworkers* panel addressed labor union and management challenges to virtually every aspect of the lead standard, both procedural and substantive.[21] RSR filed a supplemental brief in these consolidated proceedings, launching its own attack on the standard as it affected secondary lead refiners and battery breaking operations. The respirator provisions in Table II, however, were never attacked in this litigation, by RSR or anyone else, and thus were not addressed in Judge Wright's comprehensive opinion.[22]

■ The Secretary urges that RSR should nevertheless, be barred by section 6(f) of the Act, 29 U.S.C. § 655(f), from challenging the substantive validity of Table II in this enforcement proceeding, as it could and should have done so in pre-enforcement review. We agree.

Section 6(f) of the Act states, in part, that:

> Any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard.

29 U.S.C. § 655(f). Though section 6(f) is the exclusive vehicle for pre-enforcement review of an OSHA standard, its preclusive reach in contests of validity made in enforcement proceedings is disputed. The Eighth Circuit has held that all procedural challenges to OSHA standards are barred unless brought within section 6(f)'s sixty day review period. *Madison Falls, Inc. v. Marshall,* 630 F.2d 628, 629 n. 2 (8th Cir. 1980); *National Industrial Constructors, Inc. v. Occupational Safety and Health Review Commission,* 583 F.2d 1048, 1052–53 (8th Cir.1978). That circuit reasoned that complaints of procedural invalidity, unlike substantive ones, are immediately discernible and "need not await the test of time." *National Industrial Constructors,* 583 F.2d at 1052. Given an agency's interest in finality, the burdens of perpetually defending against identical procedural challenges in a multitude of protracted enforcement actions, and the danger of employer noncompliance resulting from enforcement uncertainty, section 11(a) review was held not to extend to untimely procedural attacks. *Id.*

While recognizing the appeal of the Eighth Circuit's "policy" approach, both this Circuit and the Ninth have rejected its result. *Deering Milliken, Inc., Unity Plant v. Occupational Safety and Health Review Commission,* 630 F.2d 1094 (5th Cir.1980); *Marshall v. Union Oil Co. of California,* 616 F.2d 1113 (9th Cir.1980). In *Deering Milliken,* this court, in an enforcement proceeding, was faced with an employer's procedural challenge to the validity of an OSHA standard promulgated under the summary procedures of section 6(a). Finding no distinction between substantive and procedural attacks, nor any clear congressional command precluding judicial review, in either the language or legislative history of section 6(f),[23] we con-

**21.** Judge Skelly Wright addressed procedural claims in *United Steelworkers* that included bias of the decisionmaker, improper separation of staff functions, improper use of consultants, notice deficiencies and denial of cross-examination. The varied substantive challenges went to the lead standard's medical provisions, the proper standard of review, permissible exposure limits, and the feasibility of the standard with regard to various industries, including secondary lead refining and battery manufacturing.

**22.** The circuit court stayed the effective date of the challenged provisions pending resolution of the regulation's validity. The Supreme Court issued a similar stay on December 8, 1979. The unchallenged respirator provisions, however, became effective by court order on March 1, 1979.

**23.** We stated:

> This Circuit has consistently held that "[a] long-standing and strong presumption exists that action taken by a federal agency is reviewable in federal court." *Save The Bay, Inc. v. Administrator of EPA,* 556 F.2d 1282, 1293 (5th Cir.1977). "A statute must demonstrate clear and convincing evidence of an intent to preclude judicial review before courts will cut off an aggrieved party's right to be heard."

cluded that section 6(f) was not "the exclusive vehicle for contesting the procedural validity of regulations promulgated under section 6(a)." 630 F.2d at 1097–98. The employer, who had not availed himself of section 6(f)'s pre-enforcement machinery, was therefore permitted to mount his procedural challenge in enforcement proceedings. *Id.* at 1099. This essentially mirrors both the holding and the rationale of the Ninth Circuit in *Union Oil Co. of California.*[24]

We acknowledge the contention that section 6(f), in itself, does not bar an employer from challenging at least the substantive validity of an OSHA regulation in a subse-

quent enforcement proceeding.[25] We note, however, that those courts permitting such a section 11(a) attack, including our own, have had before them regulations promulgated under the summary procedures of section 6(a), 29 U.S.C. § 655(a). These regulations have been issued without the elaborate notice and comment due process safeguards required by section 6(b).[26] Indeed, the "practical consideration[s]" accompanying the summary promulgation of these regulations formed an essential part of our reasoning in *Deering Milliken.* We there recognized the "potential number" and "technical complexity" of such standards, and acknowledged that "[i]ndustry would

---

*Gallo v. Mathews,* 538 F.2d 1148, 1151 (5th Cir.1976). *See Consolidated-Tomoka Land Company v. Butz,* 498 F.2d 1208, 1209 (5th Cir.1974). This position is consistent with the Supreme Court's mandate in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967): "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." 630 F.2d at 1099.

**24.** The *Union Oil* court allowed the procedural invalidity of a section 6(a) regulation to be raised as an affirmative defense in an enforcement proceeding. In its search for "express authorization from Congress," the Ninth Circuit reasoned:

This court, following the Supreme Court's lead, has consistently held that judicial review of agency action "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). *See, e.g., County of Alameda v. Weinberger,* 520 F.2d 344, 348 (9th Cir.1975). "There is no presumption against judicial review and in favor of administrative absolutism ... unless that purpose is fairly discernible in the statutory scheme." *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 831–32, 25 L.Ed.2d 184 (1970). 616 F.2d at 1117–18.

The Third Circuit also appears to permit claims of substantive or procedural invalidity to be raised in either § 11(a) or § 6(f) review of an administrative regulation. *Atlantic & Gulf Stevedores, Inc. v. Occupational Safety and Health Review Commission,* 534 F.2d 541, 551 (3d Cir. 1976) (Longshoremen's and Harbor Workers' Compensation Act regulation summarily adopted as OSHA standard through 29 U.S.C. § 653(b)(2)).

**25.** The legislative history of section 6(f) indicates that while the sixty day post-promulgation period "would be the exclusive method for obtaining pre-enforcement judicial review of a standard, the provision does not foreclose an employer from challenging the validity of a standard during an enforcement proceeding." S.Rep. No. 91–1282, 91st Cong., 2d Sess., 8, *reprinted in* [1970] U.S.Code Cong. & Ad.News, 5177, 5184. The Eighth Circuit has recognized that "an employer's right to challenge on *substantive* grounds an allegedly arbitrary or unreasonable regulation" should not be restricted to section 6(f)'s pre-enforcement period. *National Industrial Constructors,* 583 F.2d at 1052 (emphasis added). *See also Deering Milliken,* 630 F.2d at 1099; *Union Oil Co. of California,* 616 F.2d at 1117.

**26.** Section 6(a) was enacted as an interim measure to allow the Secretary, for the first two years after OSHA's effective date, to circumvent the procedures of the Administrative Procedure Act and summarily promulgate "any national consensus standard" or "any established Federal Standard." 29 U.S.C. § 655(a). A "national consensus standard" is one that "(1) has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the Secretary, after consultation with other appropriate Federal agencies." 29 U.S.C. § 652(9). An "established Federal standard" is "any operative occupational safety and health standard established by any agency of the United States and presently in effect, or contained in any Act of Congress in force on December 29, 1970." 29 U.S.C. § 652(10).

have found it quite burdensome to comb through every 6(a) regulation and object to inappropriate promulgations within sixty days, considering the 'multitude of regulations [which] could have been promulgated without notice or hearing within two years of the enactment of OSHA.'" 630 F.2d at 1099, *quoting Union Oil Co. of California,* 616 F.2d at 1118. In the context of section 6(a) regulations, industry may very well be "lulled" into a false sense of security inducing pre-enforcement inaction. *Deering Milliken,* 630 F.2d at 1099.[27]

RSR, however, was neither "lulled" nor inactive with respect to the section 6(b) lead regulation at issue here. As already noted, it had ample opportunity to participate in both the promulgation and pre-enforcement review of the lead standard. Unlike the employer in *Deering Milliken,* RSR took advantage of both these opportunities for administrative, 29 U.S.C. § 655(b), and judicial, 29 U.S.C. § 655(f), review. If it had challenged Table II's validity in these earlier proceedings, RSR would undoubtedly be precluded from re-litigating the issue here. *See Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Stevenson v. International Paper Co., Mobile, Alabama,* 516 F.2d 103, 109–10 (5th Cir.1975). RSR selected the 3M 9910 respirator in March of 1978 and the lead standard was issued in November of that same year. The company's monitoring program alerted it to the high concentrations of airborne lead in the battery wrecker division and to the elevated blood lead levels of its employees. The purported deficiencies in Table II were apparent on its face and did not require a maturation period. *Atlantic & Gulf Stevedores,* 534 F.2d at 550. Thus, RSR knew it was in violation of Table II's respirator guidelines at the very time it was contesting the lead regulation's validi-

ty. It raises no issue today that did not exist at this earlier time, nor cites any change in fact or law since then excusing its untimely challenge.

■ An agency has an interest in finality and conservation of its resources. It should not be compelled to defend the same regulation against identical attacks in successive enforcement actions, when those challenges could and should have been asserted in the period for pre-enforcement review. Nor should a court be vexed with a multiplicity of section 11(a) review petitions alleging an invalidity that could have earlier been finally resolved. Though the presumption in favor of judicial review is "strong," *Deering Milliken,* 630 F.2d at 1099, Congress could not have intended, in these circumstances, to permit perpetual review.

This reading of the Act not only serves the efficiency goals of agencies and courts, but also implements the core concerns of the Act itself. The very objective of OSHA was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources...." 29 U.S.C. § 651(b). The uncertainty of enforcement may inhibit an employer, like RSR, from complying with a regulation and encourage him to stockpile known challenges to a regulation's validity until its fortuitous application to his own business, all the while jeopardizing the safety of his employees and thwarting this Congressional purpose. An employer cannot, even in good faith, unilaterally decide that an OSHA standard is arbitrary or unreasonable, and disregard it, rather than raising

---

**27.** The purpose of the section 6(a) short-cut was to enable the Secretary to enact "as rapidly as possible" standards that would provide at least a "nationwide minimum level of health and safety." S.Rep. No. 91–1282, 91st Cong., 2d Sess. 6, *reprinted in* [1970] U.S.Code Cong. & Ad.News 5177, 5182. As the industries were already familiar with such standards and probably had a previous opportunity to comment upon them

when they were initially promulgated, the Secretary was allowed to dispense with usual rule-making procedures. Any subsequent modifications to such summary regulations, however, must be accompanied by section 6(b) formalities. *See Union Oil Company of California,* 616 F.2d at 1115–16; *Usery v. Kennecott Copper Corp.,* 577 F.2d 1113, 1117–18 (10th Cir.1977).

its invalidity at the earliest opportunity available to him.[28]

We therefore hold that when an employer has participated in the rulemaking and pre-enforcement review of an OSHA regulation and could have then asserted either a substantive or procedural challenge to its validity, but did not, and has no excuse for its failure to do so, we will not entertain the challenge in an enforcement proceeding. We recognize that some issues of validity will not gain sufficient definition before actual enforcement. *See American Trucking Association, Inc. v. I.C.C.,* 673 F.2d 82, 85 (5th Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983) (Hobbs Act). But such is an adequate justification for first raising the issue in enforcement proceedings even for a participant in pre-enforcement proceedings. RSR had a full and fair opportunity to challenge the validity of the respirator selection table in the section 6(f) pre-enforcement proceedings in which it participated. It is thus foreclosed from now attacking the bases of the Table's promulgation in this section 11(a) review. In so doing, we do not rest upon res judicata or equitable estoppel. Rather, we find in the relevant act of Congress and our inherent power to prevent an abuse of our resources,[29] the warrant for the door we close today.

### III

We turn now to those defenses available only in enforcement proceedings. RSR contends that even if the respirator selection table was validly promulgated, the Commission erred in failing to consider whether compliance with the standard posed a "greater hazard" than noncompliance and in finding RSR's violation to be a "serious" one within the meaning of the Act. We find both these contentions to be without merit and the Commission's order to be supported by substantial evidence.

### A.

 RSR argues that the ALJ erred in failing to consider whether compliance with Table II posed a greater threat to the battery wrecker employees than noncompliance and continued use of the half-mask respirator. This circuit recognizes "greater hazard" as an affirmative defense to an OSHA citation. *Cleveland Consolidated, Inc. v. Occupational Safety and Health Review Commission,* 649 F.2d 1160, 1165 (5th Cir.1981); *Fred Wilson Drilling Co., Inc. v. Marshall,* 624 F.2d 38, 40 (5th Cir. 1980); *Irwin Steel Erectors, Inc. v. Occupational Safety and Health Review Commission,* 574 F.2d 222, 224 (5th Cir.1978). RSR asserts this defense for the first time here on appeal, however, and we therefore lack jurisdiction to review it.

 Section 11(a) of the Act, 29 U.S.C. § 660(a), bars judicial review of any objection not "urged before the Commission" unless such omission is "excused because of extraordinary circumstances." [30] Given the agency's right to be afforded the "opportunity to correct its own mistakes," we will not lightly disregard this jurisdictional prerequisite. *Power Plant Division, Brown & Root, Inc. v. Occupational Safety and Health Review Commission,* 659 F.2d 1291, 1294 (5th Cir.1981), *modified,* 673 F.2d 111 (5th Cir.1982), *quoting Keystone Roofing Co. v. Occupational Safety and Health Review Commission,* 539 F.2d

---

**28.** The Secretary notes the administrative avenues of relief open to RSR before an OSHA citation issues. Even if RSR selected the half-mask respirator in the good faith belief its employees would not wear the full facepiece one required by Table II, it could have alerted the agency of its concerns through a petition to amend the standard, 29 U.S.C. § 655(b), or a petition for a variance, 29 U.S.C. § 655(d). But significantly, while its petition was being decided the workers would enjoy the protection prescribed, at least until it was decided that the employer's proposal was adequate.

**29.** In so holding, we remain faithful to the tenets of *Cohens v. Virginia,* 19 U.S. 264 (6 Wheat), 5 L.Ed. 257 (1821) and the strong presumption favoring judicial review.

**30.** 29 U.S.C. § 660(a) in part provides that "[n]o objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

960, 964 (3d Cir.1976). While an objection need not be specifically raised in an employer's Commission review petition, this court will consider it only if the Commission has at least been "alerted" to the issue and given the opportunity to pass on it. *Power Plant Division,* 654 F.2d at 1294; *Cleveland Consolidated,* 649 F.2d at 1164–65.

We do not believe the Commission was "alerted" to RSR's "greater hazard" defense. Though RSR's factual evidence was consistently directed to establishing that the use of its 3M 9910 respirator provided adequate protection and greater safety than that required by Table II, it was put forward solely to demonstrate the substantive invalidity of the Table or the non-serious nature of the violation. Both these challenges focused the Commission's attention on whether RSR had shown lack of "substantial evidence in the record considered as a whole" to support the ALJ's factual and policy determinations. 29 U.S.C. § 655(f). *See Texas Independent Ginners Association v. Marshall,* 630 F.2d 398, 404 (5th Cir.1980); *American Petroleum Institute v. OSHA,* 581 F.2d 493, 497 (5th Cir.1978), *aff'd on other grounds, sub nom. Industrial Union Department, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980); *Florida Peach Growers Association, Inc. v. United States Department of Labor,* 489 F.2d 120, 127 (5th Cir.1974). A "greater hazard" defense, on the other hand, would require the Commission to make findings substantially different than that required in an attack on rulemaking authority. The record would have had to demonstrate, by a preponderance of the evidence, not only that "the hazards of compliance are more than the hazards of non-compliance," but also that "alternative means of protecting employees are unavailable, and that a variance application under section 6(d) of the Act would be inappropriate." *Irwin Steel Erectors,* 574 F.2d at 224 (5th Cir.1978), *quoting Secretary v. Russ Kaller, Inc., T/A Surfa Shield,* 4 O.S.H.Cas. (BNA) 1758, 1759 (1976). *See also True Drilling Co. v. Donovan,* 703 F.2d 1087, 1090 (9th Cir.1983); *General Electric Co. v. Secretary of Labor,* 576 F.2d 558, 560–62 (3d Cir.1978).

The Commission did not have evidence before it to rule on the availability of alternative means or the appropriateness of a variance.[31] RSR's pleadings and petition for discretionary review centered Commission attention on its "promulgation" and "non-serious" defenses.[32] The Commission, then was not sufficiently alerted to the narrow "greater hazard" defense so as to have an opportunity to pass on it. As no showing of extraordinary circumstance justifying the omission is advanced,[33] we lack jurisdiction to review it.

**B.**

RSR finally urges this court to find that its "technical" violation of the

---

**31.** This court, in *Irwin Steel Erectors,* found it unnecessary to pass upon the propriety of applying the *Russ Kaller* three-prong standards, as there was substantial evidence to support the Commission's finding that the employer had not met his burden of showing greater danger in compliance. 574 F.2d at 224. We did, however, acknowledge that the *Commission* required such a showing in order to assert a greater hazard defense. *Id.* If "variance" and "alternative means" are Commission prerequisites to the defense, an employer necessarily must put forward evidence of both to so defend before the agency. RSR admits it believed the variance option to be "fruitless," and chose instead to "assert its defenses here." "Probable futility," however, does not dispense with the need to make a Commission objection. *Power Plant Division,* 659 F.2d at 1294 (not "extraordinary circumstance".) *See also United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

**32.** In fact, RSR's petition for discretionary review actually diverted the Commission from ruling on whether compliance was more hazardous than noncompliance. Though wearer resistance to the full-mask respirator is crucial to RSR's greater hazard defense, RSR informed the Commission that "[t]he question is not whether respondent can enforce the wearing of an 'unaccepted respirator' but rather whether the Secretary promulgated a standard that is unlawful because it is unnecessary and inappropriate to insure a safe, healthful workplace."

**33.** *See supra* note 31.

respirator selection table is "de minimus" and not a "serious" one within the meaning of section 17(j) of the Act, 29 U.S.C. § 666(j).[34] We find, however, that substantial evidence supports the conclusion that a "substantial probability that death or serious physical harm could result from the violation" of which RSR either knew or could have known "with the exercise of reasonable diligence." *Id.*

The OSHA inspection indicated the battery wrecker employees were overexposed to toxic levels of airborne lead. RSR admits that its use of the 3M 9910 respirator at those concentrations violated Table II standards. The inspection officer evaluated all other aspects of RSR's lead hygiene program and found them in compliance with applicable regulations.[35] Biological monitoring indicated that over sixty percent of the employees had blood leads exceeding known toxic levels. Thus the Commission finding that the selection of improper respirators caused these elevated levels, and that lead exposure induces toxic effects[36] are supported by substantial evidence and adequately brace the conclusion that RSR's violation posed a substantial probability of at least serious physical harm.[37]

There is also substantial evidence that RSR had "actual or constructive knowledge of the presence of the violation." *Bunge Corporation v. Secretary of Labor,* 638 F.2d 831, 834 (5th Cir.1981). *See also Everglades Sugar Refinery, Inc. v. Donovan,* 658 F.2d 1076, 1081–82 (5th Cir.1981). RSR's own monitoring program alerted it

both to the concentrations of airborne lead in the battery wrecker division and to the elevated blood levels of its employees. It knew of the Table II requirements, yet consciously selected a respirator in violation of its standards. As the Commission finding of serious violation, supported by substantial evidence, is conclusive, 29 U.S.C. § 660(a), its order is AFFIRMED.

---

**34.** 29 U.S.C. § 666(j) sets out the statutory requirements for a serious violation under the Act:

> [a] serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

**35.** *See supra* note 11 and accompanying text.

**36.** There was uncontradicted testimony that lead exposure could result in damage to the central nervous system, the peripheral nervous system, the reproductive system, and the kidneys. *See also United States Steelworkers v. Marshall,* 647 F.2d at 1252–59.

**37.** A finding of actual injury is not required to establish a serious violation of the statute. *Shaw Construction Inc. v. Occupational Safety and Health Review Commission,* 534 F.2d 1183, 1185 (5th Cir.1976). A violation can be "serious" even though the "accident itself is merely possible." *East Texas Motor Freight, Inc. v. Occupational Safety and Health Review Commission,* 671 F.2d 845, 849 (5th Cir.1982).