# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 10, 2019        Decided May 15, 2020

No. 18-1282

KIEWIT POWER CONSTRUCTORS CO.,
PETITIONER

v.

SECRETARY OF LABOR, U.S. DEPARTMENT OF LABOR,
RESPONDENT

Consolidated with 18-1317

On Petitions for Review of a Final Order of
the Occupational Safety & Health Review Commission

*Scott Glabman*, Senior Appellate Attorney, U.S. Department of Labor, argued the cause for petitioner Secretary of Labor. With him on the briefs were *Edmund C. Baird*, Associate Solicitor for Occupational Safety and Health, and *Charles F. James*, Counsel for Appellate Litigation. *Brian A. Broecker* and *Louise M. Betts*, Attorneys, entered appearances.

*Victoria L. Bor* and *Esmeralda Aguilar* were on the brief for *amicus curiae* North America's Building Trades Unions in support of petitioner, Secretary of Labor, U.S. Department of Labor, seeking reversal of OSHRC's final order.

*Arthur G. Sapper* argued the cause for respondent Kiewit Power Constructors Co. With him on the briefs were *John F. Martin* and *Melissa A. Bailey*.

*Bradford T. Hammock* was on the brief for *amicus curiae* National Association of Home Builders in support of Kiewit Power Constructors Co. seeking affirmance of OSHRC's final order.

Before: HENDERSON, GRIFFITH and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Occupational Safety and Health Act of 1970 (OSH Act), 29 U.S.C. §§ 651 *et seq.*, directs the Secretary (Secretary) of the United States Department of Labor (DOL) to issue safety and health standards for the protection of American workers, *id.* § 651(b)(3). To expedite the development of national regulations, section 6(a) authorized the Secretary, for two years after the OSH Act's enactment, to promulgate then-current federal safety standards without regard to formal rulemaking procedures. *Id.* § 655(a). Relevant here, 41 C.F.R. § 50-204.6(c), which requires quick-drenching eyewash facilities for workers exposed to corrosive materials, was among the many preexisting standards adopted pursuant to this limited rulemaking exemption. *See* 29 C.F.R. § 1910.151(c). Pre-1971, § 50-204.6 had applied only to manufacturers and suppliers working under federal contracts but, after its adoption under the OSH Act, the Secretary began to enforce the quick-drenching provision against employers in other industries, including construction. In 1993, without notice and comment, the quick-drenching provision was formally designated as a construction safety standard. *See* 29 C.F.R. § 1926.50(g).

In 2011 the Occupational Safety and Health Administration (OSHA) cited Kiewit Power Constructors Co. (Kiewit) for a "serious" violation of § 1926.50(g). Kiewit contested the citation, arguing that the quick-drenching provision was invalidly applied to the construction industry without notice-and-comment rulemaking. An administrative law judge (ALJ) agreed, *Kiewit Power Constructors Co.*, No. 11-2395 (OSHRC Dec. 24, 2012) (ALJ) [hereinafter ALJ Decision], as did the Occupational Safety and Health Review Commission (OSHRC or Commission), *Kiewit Power Constructors Co.*, 27 BNA OSHC 1445 (No. 11-2395, 2018) [hereinafter OSHRC Decision]. The Commission vacated Kiewit's citation but declined to issue a declaratory order declaring § 1926.50(g)'s invalidity. The Secretary and Kiewit cross-petitioned for review. Because we conclude that the Secretary's interpretation of the OSH Act is reasonable and therefore entitled to deference from the Commission, we grant the Secretary's petition for review, deny Kiewit's and reverse the Commission's decision.

I.

A.

The OSH Act established a comprehensive regulatory scheme "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Until then, workplace safety was addressed in a patchwork manner by federal and state regulations and, to a degree, employers' voluntary efforts. *See* S. Rep. No. 91-1282, at 3–4 (1970). The measures were largely ineffective. In the four years preceding the Act's adoption, more Americans were killed at work than in the Vietnam War and the increasing human and economic cost of industrial hazards became a matter of serious national concern. *See id.* at 2.

A key deficiency of then-existing federal protections was that they did not extend to all employers. For example, safety standards promulgated pursuant to the Walsh-Healey Public Contracts Act of 1936, 49 Stat. 2036 (codified as amended at 41 U.S.C. §§ 6501–6511), applied only to manufacturers and suppliers operating under federal contracts, *see* 41 U.S.C. § 6502(4). Other labor laws similarly conditioned coverage on the existence of a federal nexus. The Contract Work Hours and Safety Standards Act, 76 Stat. 357, amended by—and popularly referred to as—the Construction Safety Act of 1969 (CSA), Pub. L. No. 91-54, 83 Stat. 96 (codified as amended at 40 U.S.C. § 3704), authorizes the regulation of contractors and subcontractors working on federally funded construction projects, *see* 40 U.S.C. § 3704(a)(1). These circumscribed scopes meant that, in a given industry, many workers remained unprotected even as others were covered by applicable federal standards.

The OSH Act aimed to close this coverage gap by facilitating the development of "uniformly applied" standards, S. Rep. No. 91-1282, at 1, to cover all "businesses affecting interstate commerce," 29 U.S.C. § 651(b)(3). The Secretary was therefore "authoriz[ed] . . . to set mandatory occupational safety and health standards," *id.*, that "require[] conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment," *id.* § 652(8).[1] The primary mechanism for establishing occupational safety and health (OSH) standards was set out in section 6(b), which requires the Secretary to

---

[1] "The Secretary has delegated this [standard-promulgation] responsibility to the Assistant Secretary for Occupational Safety and Health," who heads OSHA. *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1292 (D.C. Cir. 1995) (citing *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 147 n.1 (1991)).

"promulgate, modify, or revoke" any OSH standard in accordance with notice-and-comment rulemaking procedures. *Id.* § 655(b).

Alternatively, section 6(a) provided an expedited, albeit temporary, path for the issuance of standards. Although existing protective measures had failed to abate industrial risk adequately, there remained value in "establish[ing] as rapidly as possible national occupational safety and health standards with which industry is familiar." S. Rep. No. 91-1282, at 6. Thus, for a two-year period following the OSH Act's effective date, the Secretary was to, "as soon as practicable" and "[w]ithout regard to" the rulemaking procedures in section 6(b) or the Administrative Procedure Act (APA), 5 U.S.C. §§ 500 *et seq.*, promulgate as an OSH standard "any national consensus standard, and any established Federal standard, unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees," 29 U.S.C. § 655(a). A "national consensus standard" is one "adopted and promulgated by a nationally recognized standards-producing organization," following certain procedural safeguards. *Id.* § 652(9).[2] An

---

[2]  In particular, a "national consensus standard":

> (1) . . . has been adopted and promulgated . . . under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has been designated as such a standard by the

"established Federal standard," by comparison, is "any operative occupational safety and health standard established by any agency of the United States . . . or contained in any Act of Congress" as of the OSH Act's enactment. *Id.* § 652(10).

The Secretary soon invoked his section 6(a) authority and, excused from formal rulemaking, adopted scores of national consensus and established Federal standards as OSH standards. *See* National Consensus Standards and Established Federal Standards, 36 Fed. Reg. 10,466 (May 29, 1971). Part 1910 was added to Title 29 of the Code of Federal Regulations to house the new OSH standards. *Id.* Not all established Federal standards, however, were adopted into Part 1910 in the same manner. The CSA standards codified in Part 1926[3]—promulgated a mere eleven days before the OSH Act's effective date—were incorporated by reference in Subpart B. *See id.* at 10,469 (adopting 29 C.F.R. § 1910.12). These new OSH standards remained tethered to the CSA standards "prescribed in [P]art 1926[,] . . . apply[ing] . . . according to the provisions thereof," although coverage was extended "to every employment and place of employment of every employee engaged in construction work." 29 C.F.R. § 1910.12(a). Subpart B also incorporated by reference standards issued pursuant to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 44 Stat. 1424 (1927) (codified as amended at 33 U.S.C. §§ 901 *et seq.*), which covers

---

Secretary, after consultation with other appropriate Federal agencies.

29 U.S.C. § 652(9).

[3] The CSA standards were originally codified at Part 1518, *see* Safety and Health Regulations for Construction, 36 Fed. Reg. 7340 (Apr. 17, 1971), but, for ease of reference, we refer to their current designation at Part 1926, *see* Redesignation, 36 Fed. Reg. 25,232 (Dec. 30, 1971).

employers operating on the navigable waters of the United States, 33 U.S.C. §§ 902(4), 941; *see* National Consensus Standards and Established Federal Standards, 36 Fed. Reg. at 10,469 (adopting 29 C.F.R. §§ 1910.13–1910.16).

The Walsh-Healey standards, however, were given new designations elsewhere in Part 1910. Relevant here, Walsh-Healey's "quick-drenching" eyewash standard, 41 C.F.R. § 50-204.6(c), was recodified at 29 C.F.R. § 1910.151(c), *see* National Consensus Standards and Established Federal Standards, 36 Fed. Reg. at 10,601.[4] Although promulgation as distinct Part 1910 standards suggested that the original Walsh-Healey standards were to have a broader scope than those first promulgated under the CSA and LHWCA, their reach was far from clear. On the one hand, § 1910.5(c)(2) seemed to contemplate that the general standards in Part 1910, i.e., those derived from Walsh-Healey standards, were meant to fill in regulatory gaps left by particular standards, like the construction standards prescribed in Subpart B. *See* 29 C.F.R. § 1910.5(c)(2) ("[A]ny standard shall apply according to its terms to any employment and place of employment *in any industry*, even though particular standards are also prescribed for the industry, . . . to the extent that none of such particular standards applies.") (emphasis added). On the other hand, § 1910.5(e) appeared to foreclose such a broad application, declaring that any OSH standard derived from a Walsh-Healey standard "is intended to apply to manufacturing or supply operations which would be subject to the Walsh-Healey Public Contracts Act if there were a Federal contract . . . involved." National Consensus Standards and Established Federal

---

[4] "Where the eyes or body of any person may be exposed to injurious corrosive materials, suitable facilities for quick drenching or flushing of the eyes and body shall be provided within the work area for immediate emergency use." 29 C.F.R. § 1910.151(c).

Standards, 36 Fed. Reg. at 10,468 (adopting 29 C.F.R. § 1910.5(e)).

Any confusion was eliminated, however, when OSHA revoked § 1910.5(e) on September 9, 1971, a little over three months after the OSH standards were promulgated. *See* Applicability of Some Established Federal Standards, 36 Fed. Reg. 18,080, 18,081 (Sept. 9, 1971). OSHA once again invoked section 6(a) to bypass rulemaking procedures, *id.*, claiming additional authority under 29 C.F.R. § 1910.4(b), which authorized OSHA to "modify or revoke" any Part 1910 standard for the full two-year period provided by section 6(a). Although the published notice is short on reasoning, the revocation's stated purpose was "to remove the limitation to the application of the standards so that they may apply to every employment and place of employment exposed to the hazards covered by the standards." Applicability of Some Established Federal Standards, 36 Fed. Reg. at 18,081.

Nevertheless, questions remained as to whether—and to what extent—the construction industry was subject to the general industry standards. The Subcommittee on Editing Part 1910 for Construction Operations was convened in January 1974 to consider which general standards "may be applicable to construction operations," Notice of Subcommittee Meeting, 39 Fed. Reg. 861 (Jan. 3, 1974), but it failed to resolve the lingering uncertainty. Years later, in February 1979, OSHA responded to petitions from "both labor and management within the construction industry . . . to develop a single set of OSHA regulations for the exclusive use of that industry." Identification of General Industry Safety and Health Standards (29 CFR Part 1910) Applicable to Construction Work, 44 Fed. Reg. 8577 (Feb. 9, 1979). To consolidate the standards applicable to construction companies, OSHA republished Part 1926 along with the general industry standards "identified as

applicable to construction work," *id.*, including the quick-drenching provision, *id.* at 8589. OSHA's action was not a "permanent recodification," however, and merely "provide[d] a better public understanding and awareness of OSHA's enforcement policy regarding hazards in construction." *Id.* at 8577.

Although OSHA intermittently continued to issue guidance on applicable construction standards, it was not until June 30, 1993, that it formally designated applicable Part 1910 standards as Part 1926 standards. *See* Incorporation of General Industry Safety and Health Standards Applicable to Construction Work, 58 Fed. Reg. 35,076 (June 30, 1993). The quick-drenching provision thereby became a construction standard and received its own Part 1926 designation, at § 1926.50(g). *Id.* at 35,084, 35,305. And, once again, OSHA followed neither APA nor OSH Act rulemaking procedures, having determined the redesignations "do[] not affect the substantive requirements or coverage of the standards themselves" and "do[] not modify or revoke existing rights or obligations, []or . . . establish new ones." *Id.* at 35,077.

## B.

Kiewit constructs power plants and related generation facilities across North America. On August 3, 2011, OSHA visited Kiewit's worksite in Rogersville, Tennessee. It cited Kiewit for a "serious" violation[5] of 29 C.F.R. § 1926.50(g) because "employees were exposed to eye and skin burns when

---

[5] A "serious" violation exists "if there is a substantial probability that death or serious physical harm could result from" the workplace hazard, "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(k).

quick drenching facilities were not available." J.A. 14.[6] OSHA required Kiewit to abate the violation and proposed a civil penalty of $3,400. *Id.* Kiewit timely contested the citation.

The OSH Act allocates regulatory tasks between two distinct administrative actors. Whereas the Secretary is "responsib[le] for setting and enforcing workplace health and safety standards," the Commission "is assigned to 'carr[y] out adjudicatory functions.'" *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 147 (1991) (second alteration in original) (quoting 29 U.S.C. § 651(b)). Thus, the Secretary, through his OSHA inspectors, issues citations, including the one charging Kiewit. After "an employer notifies the Secretary that he intends to contest a citation," the Commission must provide an opportunity for an evidentiary hearing and "shall thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's citation or proposed penalty." 29 U.S.C. § 659(c). "Initial decisions are made by an [ALJ], whose ruling becomes the order of the Commission unless the Commission grants discretionary review." *Martin*, 499 U.S. at 148 (citing 29 U.S.C. § 661(j)).

Before the ALJ, Kiewit filed a Motion to Dismiss or for Summary Judgment, asserting that § 1926.50(g) was invalidly promulgated without notice and comment; it also sought a declaratory order affirming the same. OSHRC Decision at 1446 n.1; ALJ Decision at 1. The ALJ granted the motion to dismiss, deeming the 1993 recodification of the quick-drenching provision a substantive change that could be accomplished only through rulemaking. ALJ Decision at 9–10. After vacating the citation, the ALJ found it unnecessary to decide Kiewit's motion for a declaratory order. *Id.* at 1–2, 10.

---

[6] Kiewit was also cited for two non-serious violations but did not contest them. *See* J.A. 15.

Both the Secretary and Kiewit petitioned the Commission for discretionary review. The Secretary challenged the vacatur of his citation and Kiewit argued that it was entitled to a declaratory order.

The Commission vacated the citation on September 28, 2018, over the dissent of one Commissioner. OSHRC Decision at 1446. Despite reaching the same result as the ALJ, the Commission followed a different path. Framing the issue as whether section 6(a) authorized the Secretary to adopt an established Federal standard—in this case, the Walsh-Healey quick-drenching provision—as an OSH standard and, without notice-and-comment rulemaking, broaden its scope to include industries not covered by the source standard, the Commission found "the 1993 codification . . . irrelevant in that regard." *Id.* at 1448 & n.6. In other words, if the quick-drenching provision already applied to the construction industry by virtue of earlier OSHA action, namely, the 1993 action merely formalized matters. The validity of § 1926.50(g) therefore turned on whether, back in 1971, OSHA's extension of a Walsh-Healey standard to the construction industry exceeded the scope of the rulemaking authority conferred by section 6(a).

The Commission determined that "section 6(a) . . . is silent as to whether the Secretary may apply 'any established Federal standard' adopted 'as an occupational safety or health standard' to industries beyond those the original standard covered" and "[t]he Secretary concede[d] as much." *Id.* at 1448. Despite section 6(a)'s silence, the Commission nevertheless concluded that the Secretary's interpretation of his authority thereunder was not entitled to *Chevron* deference.

First, it viewed the promulgation of § 1910.5(e)[7] as evidence that the Secretary "initially interpreted section 6(a) as *precluding* him from expanding the scope of established federal standards to other industries." *Id.* at 1449. His "complete about-face"—revoking § 1910.5(e) a mere three months later—lacked a reasoned explanation and was therefore arbitrary and capricious and undeserving of deference. *Id.* at 1449–50 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016)).

The Secretary's interpretation was "also unreasonable in light of the language of [section 6(a)], its statutory context, and the statutory history." *Id.* at 1450 (citing *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1570 (D.C. Cir. 1984)). Section 6(a) did not authorize *substantive* changes to preexisting standards—a point the Secretary does not dispute. *Id.* at 1451. Seeing no distinction between a standard's protective terms and its scope, the Commission concluded that extending an established Federal standard to a new industry effected a substantive change and was therefore impermissible. *Id.* The Secretary's interpretation would, contrary to congressional intent, subject employers to standards without first giving them an opportunity to provide input and, moreover, would create "absurdities" by applying standards without regard to the nuances of a given employment setting. *Id.* at 1450–51.

Finally, the Secretary's reliance on Commission and circuit court precedent proved unavailing, as the Commission distinguished *Bechtel Power Co.*, 4 BNA OSHC 1005 (No. 5064, 1976), *aff'd*, 548 F.2d 248 (8th Cir. 1977), and *American Can Co.*, 10 BNA OSHC 1305 (Nos. 76-5162, 77-773, 78-

---

[7] To refresh recall, § 1910.5(e) limited the application of standards originally promulgated under the Walsh-Healey Act to places of employment that would have been subject to the Walsh-Healey Act if a federal contract were involved.

4478, 1982), and similarly found *Diebold, Inc. v. Marshall*, 585 F.2d 1327 (6th Cir. 1978), and *Lee Way Motor Freight, Inc. v. Secretary of Labor*, 511 F.2d 864 (10th Cir. 1975), inapposite, *see* OSHRC Decision at 1454.

In sum, the Commission vacated Kiewit's serious violation because § 1926.50(g) "was invalidly promulgated as a construction standard" inasmuch as "the Secretary lacked authority to expand the scope of the [Walsh-Healey] quick-drenching standard and apply [it] to the construction industry without notice-and-comment rulemaking." *Id.* However, the majority deemed Kiewit's claim that a declaratory order "might 'coerce' the Secretary into deleting the cited provision from Part 1926" too speculative. *Id.* at 1446 n.1. Commissioner Attwood dissented, finding that section 6(a) plainly authorized the Secretary to extend standards to new industries and, alternatively, that even assuming the statutory text's ambiguity, the Secretary's interpretation was reasonable and entitled to *Chevron* deference. *Id.* at 1454–55 (Attwood, Comm'r, dissenting).

Kiewit petitioned for review in our court, challenging the Commission's order insofar as it declined to grant Kiewit's requested declaratory order. The Secretary petitioned for review in the Tenth Circuit, *see* 29 U.S.C. § 660(a) (authorizing petition to be filed in court of appeals for circuit where employer has principal office), which Circuit transferred the matter to us, *see* 28 U.S.C. § 2112(a)(5) ("If proceedings are instituted in two or more courts of appeals with respect to the same order, . . . [a]ll courts . . . shall transfer those proceedings to the court in which the record is so filed."). The Secretary argues that his interpretation is reasonable and therefore entitled to *Chevron* deference and, further, that the Commission's decision is arbitrary and capricious because it departs from precedent without a reasoned explanation.

14

II.

"We begin, of course, with our jurisdiction." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 221 (D.C. Cir. 2011). Under OSH Act section 6(f), "[a]ny person who may be adversely affected by a[n OSH] standard" can seek pre-enforcement judicial review of the standard's validity "at any time prior to the sixtieth day after such standard is promulgated." 29 U.S.C. § 655(f). Although section 6(f) "would be the exclusive method for obtaining pre-enforcement judicial review of a standard, the provision does not foreclose an employer from challenging the validity of a standard during an enforcement proceeding." S. Rep. No. 91-1282, at 8. In addition, section 11(a) provides that judicial review of an enforcement proceeding may be had by "[a]ny person adversely affected or aggrieved by an order of the Commission." 29 U.S.C. § 660(a).

It was not initially apparent how these provisions interacted because "[s]ection 6(f) is silent concerning its preclusive effect on post pre-enforcement judicial review of section 6(a) regulations." *Deering Milliken, Inc. v. Occupational Safety & Health Review Comm'n*, 630 F.2d 1094, 1099 (5th Cir. 1980). The question, then, was whether *procedural* challenges could be raised at any time or only during the sixty-day pre-enforcement review period set out in section 6(f). *See id.* at 1097–98. In some circuits, only substantive validity claims could be considered in an enforcement proceeding, *see, e.g.*, *Advance Bronze, Inc. v. Dole*, 917 F.2d 944, 951–52 (6th Cir. 1990); *Nat'l Indus. Constructors, Inc. v. Occupational Safety & Health Review Comm'n*, 583 F.2d 1048, 1052–53 (8th Cir. 1978); others permitted both substantive and procedural challenges, *see, e.g.*, *Marshall v. Union Oil Co. of Cal.*, 616 F.2d 1113, 1117–18 (9th Cir. 1980); *Deering Milliken*, 630 F.2d at 1099. We

adopted the latter approach in *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575 (D.C. Cir. 1985), concluding "that Congress intended review of the validity of section 6 standards to be available in enforcement proceedings before the Commission, and that Congress drew no distinction between procedural and substantive challenges in this regard," *id.* at 583 n.2. Thus, under *Simplex*, Kiewit's procedural challenge to the quick-drenching provision "would likely be allowed." OSHRC Decision at 1454 n.1 (Attwood, Comm'r, dissenting).

The Secretary failed to contest the timeliness of Kiewit's challenge before the Commission, *id.*, and the parties do not dispute our jurisdiction under 29 U.S.C. § 660, *see* Sec'y's Br. 1; Kiewit Br 1. Even so, the jurisdictional question is one "the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). We *ex mero motu* ordered supplemental briefing to address whether *Simplex* remained good law following *JEM Broadcasting Co. v. FCC*, 22 F.3d 320 (D.C. Cir. 1994), which held that "challenges to the *procedural lineage of agency regulations*, whether raised by direct appeal . . . or as a defense to an agency enforcement proceeding, will not be entertained outside the 60-day period provided by" the Hobbs Act, *id.* at 325. We later applied *JEM* to analogous review provisions in other statutes, confirming that "procedural attacks on a rule's adoption are barred even when it is applied." *Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) (Bank Holding Company Act). The question is whether *JEM* and its progeny foreclosed what *Simplex* endorsed: the raising of an otherwise untimely procedural challenge in an enforcement proceeding.

We conclude that *Simplex* remains binding precedent and, accordingly, we have jurisdiction of this petition. Granted, *JEM* and later decisions have strictly construed statutory limitation periods, emphasizing the Congress's "determin[ation] that the agency's interest generally lies in prompt review of agency regulations." *JEM*, 22 F.3d at 325 (quoting *Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1040 (D.C. Cir. 1991)). But the fact that generalized principles of finality may bar untimely procedural attacks under other statutes says nothing about the viability of such a challenge under the OSH Act. Although we have differentiated between procedural and substantive validity in other contexts, we have not expressly rejected *Simplex*'s conclusions and the *JEM* line of precedent has not addressed the OSH Act specifically. Indicia of congressional intent can vary from one statute to another and we must take care to conduct an individualized inquiry. Indeed, in *Simplex* itself we "express[ed] no opinion as to the interpretation of any other statutes that include similar provisions." 766 F.2d at 583 n.2.

The Secretary's criticism that *Simplex* contained no independent analysis of the OSH Act's legislative history is not especially persuasive. Although the relevant discussion in *Simplex* is limited to a footnote, it does not follow that this court therefore adopted by rote the position taken by the majority of our sister circuits. On the contrary, *Simplex* made clear that we had "considered the evidence of congressional intent put forward in these cases," and were "doing no more than interpreting congressional intent as to the preclusive effects of [the OSH Act]'s provision for pre-enforcement review." *Id.* Nor can it be said that *Simplex* was decided without regard to "any of the relevant policy concerns this court would later recognize." Sec'y's Suppl. Br. 10. *JEM* was not the first time we addressed the finality interest at stake in belated procedural challenges. "In a long line of cases" going back to *Functional*

*Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958), *cert. denied*, 361 U.S. 813 (1959), "this court has repeatedly distinguished indirect attacks on the substantive validity of regulations initiated more than sixty days after their promulgation from like attacks on their procedural lineage." *NLRB Union v. FLRA*, 834 F.2d 191, 195 (D.C. Cir 1987). Yet *Simplex* did not cite *Functional Music* or any related case; it relied entirely on persuasive authority addressing the unique considerations underlying the OSH Act's review scheme. *See* 766 F.2d at 582 n.2. In other words, the *Simplex* court found the Congress's intent behind the OSH Act—not generalized finality concerns—critical to the question of section 6(f)'s preclusive effect.

Equally unavailing is the Secretary's reliance on *RSR Corp. v. Donovan*, 747 F.2d 294 (5th Cir. 1984). In *RSR Corp.*, the Fifth Circuit declined to extend *Deering Milliken*—one of the cases *Simplex* chiefly relied upon—and did not entertain a substantive validity challenge in an enforcement proceeding. *Id.* at 302. The Secretary curiously claims that *Simplex* lacked "the benefit of . . . [this] subsequent decision," Sec'y's Suppl. Br. 15, but *Simplex* was decided over six months *after RSR Corp.*, *compare Simplex*, 766 F.2d at 575 (July 5, 1985), *with RSR Corp.*, 747 F.2d at 294 (November 26, 1984). Moreover, *RSR Corp.* is readily distinguishable. Whereas the standards at issue in *Deering Milliken*, *Simplex* and this case were adopted under section 6(a), the challenged regulation in *RSR Corp.* was promulgated under section 6(b), a distinction the Fifth Circuit took care to emphasize. *See RSR Corp.*, 747 F.2d at 300–01. Employers may have been "lulled" by the fact that section 6(a) standards were supposed to "be pre-existing and familiar to industry" and it would have been "quite burdensome to comb through every 6(a) regulation and object to inappropriate promulgations within sixty days, considering the 'multitude of regulations (which) could have been promulgated without

notice or hearing within two years of the enactment of'" the OSH Act. *Deering Milliken*, 630 F.2d at 1099 (quoting *Union Oil*, 616 F.2d at 1118). RSR, on the other hand, "was neither 'lulled' nor inactive with respect to" the challenged regulation. *RSR Corp.*, 747 F.2d at 301. It participated not only in the notice-and-comment process mandated by section 6(b), but also in pre-enforcement judicial review under section 6(f). *Id.* at 298. Plainly, different finality interests are implicated if an employer has in fact had ample opportunity to express validity concerns and tries for a second bite at the apple.

We see no reason to disregard *Simplex*'s determination that the OSH Act allows for a procedural challenge in an enforcement proceeding, at least for section 6(a) standards. *See also Deering Milliken*, 630 F.2d at 1099 ("[T]he potential number and technical complexity of summarily promulgated regulations[] makes it particularly inappropriate to find section 6(f) a bar to procedural attack[s] on 6(a) regulations."). Accordingly, we do not reach Kiewit's alternative arguments, including whether section 6(f) is, in fact, non-jurisdictional.

## III.

As a preliminary matter, we consider Kiewit's motion for leave to add rebuttal arguments, which it deems necessary in order to respond to several points raised in the reply portion of the Secretary's reply and cross-respondent's brief. We disagree. Although styled differently, Kiewit's motion for leave to add rebuttal arguments seeks, in effect, to file a surreply. *See, e.g., Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1383 (S.D. Ga. 2015) ("The purpose of a [surreply] is to rebut arguments advanced in an opposing party's reply brief . . . .") (citation omitted). "Surreplies are generally disfavored and [Kiewit] has not demonstrated that the requested relief is

warranted." *Hall v. U.S. Dep't of Labor*, No. 18-5100, 2018 WL 5919255, at \*1 (D.C. Cir. Nov. 1, 2018).

First, Kiewit asserts that the Secretary's reply brief improperly made several new arguments. It is true that "[w]e will not consider a novel contention first advanced in a reply brief," *Asociacion de Compositores y Editores de Musica Latinoamericana v. Copyright Royalty Tribunal*, 809 F.2d 926, 928 (D.C. Cir. 1987), but that is not the case here. The arguments Kiewit complains of appear in the Secretary's principal brief, in substantially similar form. The real issue, then, is that Kiewit disagrees with the Secretary's position. For example, Kiewit claims the Secretary's reply brief added new points on legislative history but the substance of its proposed rebuttal focuses solely on the Secretary's purported textual mischaracterizations.[8] That the Secretary draws different conclusions from the underlying sources is insufficient to justify a rebuttal. And to the extent the Secretary adopted any "new" positions, he was simply responding to contentions made by Kiewit. This is the very nature of a reply brief. *See, e.g.*, *United States v. Van Smith*, 530 F.3d 967, 973 (D.C. Cir. 2008). Nor has Kiewit demonstrated that rebuttal argument is warranted to respond to several alleged misstatements in the Secretary's reply brief. Kiewit does not claim the offending arguments were newly raised. Instead, it simply frames the interpretive dispute as the basis for additional briefing.

Finally, Kiewit contends the Secretary's argument that we may not distinguish cases on grounds not used by the

---

[8] In fact, Kiewit has itself mischaracterized the alleged mischaracterizations. For example, it quotes language from the Secretary's brief, making much of the fact that the exact wording does not appear in any of the Secretary's cited sources. But Kiewit references the Secretary's own language—it is entirely expected that the Secretary's word choice differs from the sources he cites.

Commission is inconsistent with circuit precedent. This dispute is ultimately irrelevant to our disposition because we do not decide the Secretary's arbitrary-and-capricious challenge. *See infra* at 37. In any event, rebuttal briefing is unwarranted. The Secretary's argument was in response to Kiewit—not the Commission—so it could not have been raised earlier than the reply brief. Although Kiewit concedes it could raise the same objections in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j), it touts the fact that permitting a rebuttal argument will save ninety-two words. There are good reasons why this minute reduction, without more, does not justify a departure from the normal cross-briefing rules. In contrast to the proposed rebuttal, the Secretary would have an opportunity to respond to a 28(j) letter. Allowing rebuttal argument on these facts risks opening the door to any litigant that disagrees with the opposing party's arguments to evade the standard briefing requirements and gain the last word. We decline to do so and deny Kiewit's motion in full.

## IV.

We review the Commission's orders according to "[f]amiliar principles of administrative law" and set aside its "legal determinations . . . [if] they are 'arbitrary, capricious, . . . or otherwise not in accordance with law.'" *A.J. McNulty & Co. v. Sec'y of Labor*, 283 F.3d 328, 331–32 (D.C. Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). At issue is whether OSH Act section 6(a) authorized the Secretary to apply the quick-drenching provision to industries beyond those covered by the original Walsh-Healey standard. We generally defer to the Secretary's interpretation "so long as the statutes and regulations in question are ambiguous and the Secretary's interpretations are reasonable," *AKM LLC v. Sec'y of Labor*, 675 F.3d 752, 754 (D.C. Cir. 2012) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984)), but

our inquiry is "a little unusual" because the Secretary and the Commission have adopted conflicting interpretations of the OSH Act and its implementing regulations, *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C. Cir. 1995).

"When, as here, 'the Secretary and the Commission divide, it [is] . . . the Secretary rather than the Commission [who] is entitled to" deference, *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003) (alterations in original) (quoting *Sec'y of Labor v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir. 1989)), "even where the Secretary offers his interpretation in the context of litigation before the Commission," *S.G. Loewendick & Sons*, 70 F.3d at 1294 (citing *Martin*, 499 U.S. at 157 ("[T]he Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard.")). This approach reflects "the distinct functions of the Commission and of the Secretary. Because the Secretary, not the Commission, is the policymaker, we defer to the Secretary's interpretation . . . . We do not owe the same deference to interpretations independently offered by the Commission . . . ." *Id.* at 1294 (citing *Martin*, 499 U.S. at 156–57). And because we "treat the Commission 'as equivalent to a "nonpolicymaking" district court,'" *id.* at 1295 (quoting *Molineaux v. United States*, 12 F.3d 264, 267 (D.C. Cir. 1994)), it too must defer to the Secretary's reasonable interpretations, *see Excel Mining,* 334 F.3d at 5–6.

"Under step one of *Chevron*, we 'ask whether Congress has directly spoken to the precise question at issue, in which case we must give effect to the unambiguously expressed intent of Congress.'" *Sec'y of Labor v. Nat'l Cement Co. of Cal.*, 494 F.3d 1066, 1073–74 (D.C. Cir. 2007) (quoting *Bluewater Network v. EPA*, 372 F.3d 404, 410 (D.C. Cir. 2004) (internal

quotation marks omitted)). "If the 'statute is silent or ambiguous with respect to the specific issue,' however, we move to the second step and defer to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'" *Bluewater Network*, 372 F.3d at 410 (quoting *Chevron*, 467 U.S. at 843). We agree with the Commission that the OSH Act is ambiguous regarding the Secretary's authority to apply established Federal standards to new industries under section 6(a), *see* OSHRC Decision at 1448,[9] but we conclude that the Secretary's interpretation of his section 6(a) authority is permissible and therefore owed deference by the Commission.

## A.

"To discern the Congress's intent, we generally examine the statutory text, structure, purpose and its legislative history." *Lindeen v. SEC*, 825 F.3d 646, 653 (D.C. Cir. 2016) (citing *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)). "The starting point for our interpretation of a statute is always its language." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)). Section 6(a) instructs the Secretary to "promulgate as an occupational safety or health standard . . . any established Federal standard," 29 U.S.C. § 655(a), but does not address whether the scope of the new OSH standard must mirror its source standard. The silence does not end our step-one analysis. Rather, to assess "[t]he plainness or ambiguity of statutory language," we must also

---

[9]  Kiewit asserts that "[t]he Commission correctly held that the legislative history shows congressional intent so clearly as to satisfy *Chevron* Step One." Kiewit Br. 41. Kiewit does not support its contention with any citation to the Commission decision. Nor could it, as Kiewit's claim flatly contradicts the Commission's express "find[ing] that section 6(a) is ambiguous." OSHRC Decision at 1448.

consider "the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

We recognized in *Simplex* that the Secretary, when acting pursuant to section 6(a), may not make a "substantially [sic] meaningful modification of the [established Federal] standard . . . during [its] transformation into an" OSH standard. 766 F.2d at 584 (quoting *Deering Milliken*, 630 F.2d at 1100).[10] Although the Secretary contends that a modification is substantive only if it alters a standard's *protective* terms, not its scope, Kiewit maintains that extending Walsh-Healey standards to the construction industry *was* in fact a substantive modification in contravention of the OSH Act's plain meaning because the revocation of § 1910.5(e) "changed § 1910.151(c) from inapplicable and not imposing a duty on constructors, to applicable and imposing one." Kiewit Br. 52. Kiewit notes that when the Secretary promulgated the initial CSA standards, the language of the "Medical Services and First Aid" standard was largely borrowed from 41 C.F.R. § 50-204.6, the Walsh-

---

[10] Although *Simplex* asked whether the modification was "*substantially* meaningful," 766 F.2d at 584 (emphasis added), it purported to quote *Deering Milliken*, which framed the inquiry as "whether a *substantively* meaningful modification of the Walsh-Healey standard occurred," 630 F.2d at 1100 (emphasis added). This subtle difference may be attributable to the fact that *Simplex* involved a national consensus standard. In that context, the Secretary is required to publish an explanation whenever a promulgated rule "differs substantially from an existing national consensus standard." 29 U.S.C. § 655(b)(8). In any event, the choice of language does not alter our analysis of the established Federal standard at issue here. *See, e.g.*, *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1332 (6th Cir. 1978) (section 6(a) "required adoption of 'established Federal' and 'national consensus' standards without substantive modification"). Indeed, Kiewit, after invoking *Simplex*'s "substantially meaningful" articulation, argues that the quick-drenching standard was substantively modified. *See* Kiewit Br. 36–38.

Healey standard that contains the quick-drenching provision. *See* Safety and Health Regulations for Construction, 36 Fed. Reg. 7340, 7347–48 (Apr. 17, 1971). Yet the quick-drenching provision was not carried over. *Id.* Any conclusion drawn from this omission is necessarily speculative. Kiewit has provided no evidence that the quick-drenching provision was debated at this time—just that the rest of § 50-204.6 informed the new CSA standard. Rather, it contends that the applicability of the Walsh-Healey standards to the construction industry, including the quick-drenching provision, remained a topic of debate until the 1993 codification of certain general standards as construction standards. But this contention is not inconsistent with the Secretary's position that general standards apply if no particular standard addresses the same hazard or working condition. *See* 29 C.F.R. § 1910.5(c)(1)–(2); Incorporation of General Industry Safety and Health Standards Applicable to Construction Work, 58 Fed. Reg. at 35,076 ("[S]ince early in its existence, . . . [OSHA] has determined that it is appropriate to cite a construction employer for violation of a part 1910 standard, to effectuate the purposes of the OSH Act."). Simply because the extent of the coverage overlap between Walsh-Healey and CSA standards was not immediately apparent does not mean that the former's extension to new industries necessarily constituted a substantive modification.

That said, the line between substantive and non-substantive modification is not easy to discern. According to Kiewit, "[s]ubstantive modification means that one is not adopting the 'established Federal standard.'" Kiewit Br. 35 (citing *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1117–18 (10th Cir. 1977)). But Kiewit's definition is far from elucidating and leaves open what it means to "not adopt" a source standard. It cannot be that any minor deviation automatically exceeds the Secretary's authority for he was not "required to promulgate existing . . . federal standards

verbatim." *Simplex*, 766 F.2d at 584 (quoting *Deering Milliken*, 630 F.2d at 1100). The question, then, is how much a source standard can be altered before the modification is impermissibly substantive. As the Commission previously recognized, the answer depends on congressional intent. "[C]hanges in a source standard are permissible if they are the sort of changes that Congress allowed the Secretary to make," *Am. Can Co.*, 10 BNA OSHC at 1311, but, here, the OSH Act is ambiguous on the point.

Neither Kiewit nor the Commission disputes that *some* modification of established Federal standards is acceptable, contemplating that the Secretary could extend the scope of such standards to cover new employers in the original industry. *See* OSHRC Decision at 1453 (section 6(a) allowed Secretary to expand scope of Walsh-Healey standards "to all manufacturers, not just those with federal contracts"); Kiewit Br. 38 ("[S]ubstantive change would not occur when the Walsh-Healey and Construction Safety standards . . . were extended to all manufacturers and constructors."). Kiewit and the Commission draw the line, however, at the extension to employers in a *different* industry. But the language of the OSH Act does not plainly support this implicit limitation.

Granted, there are some colorable arguments that the scope of a new OSH standard promulgated under section 6(a) was intended to mirror that of its source standard. Established Federal standards encompass "any operative [OSH] standard established by any agency of the United States and presently in effect." 29 U.S.C. § 652(10). In turn, an OSH standard "requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* § 652(8). Kiewit contends that once a standard found to be "reasonably

necessary or appropriate" for the protection of workers in a specific industry is extended to additional industries, it is no longer the same established Federal standard because no finding has been made that the standard is in fact "reasonably necessary or appropriate" for the new "employment" and "places of employment." *See* Kiewit Br. 36–37. Accordingly, Kiewit asserts that the Secretary cannot utilize section 6(a)— which authorizes the promulgation of established Federal standards "presently in effect"—to extend the quick-drenching standard to the construction industry because he never found the standard "reasonably necessary or appropriate" to protect construction workers.[11] *Id.*

At the same time, the express limitations on the Secretary's section 6(a) authority suggest a more expansive scope for newly adopted OSH standards. The OSH Act

---

[11] The Commission made a related argument, asserting that Walsh-Healey standards "'presently in effect' at the time did not apply to the construction industry," OSHRC Decision at 1450, but its position is unpersuasive. As Commissioner Attwood noted in her dissent, "presently in effect" is more naturally read as a requirement that the established Federal standard must have been "on the books," i.e., "in effect on or after the effective date of the OSH Act." *Id.* at 1457–58 (Attwood, Comm'r, dissenting). Moreover, rigidly fixing the scope of established Federal standards would preclude even the more limited extensions that the Commission itself accepted. That is, extending a Walsh-Healey standard to manufacturers without federal contracts also alters the scope of the standard "presently in effect" at the time of promulgation. The Commission replies that established Federal standards must also be "operative" and that Walsh-Healey standards "were operative only as to the manufacturing industry." *Id.* at 1450 fn. 11 (majority opinion). Yet the Commission does not dispute that *all* manufacturers would be covered by a new OSH standard, even though manufacturers without federal contracts fell outside the "operative" scope of the precursor Walsh-Healey standard. *See id.*

instructs the Secretary to promulgate any established Federal standard "unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees." 29 U.S.C. § 655(a). If adopting a Walsh-Healey standard as an OSH standard expanded coverage to manufacturers and suppliers without federal contracts only, it is difficult to imagine when such a standard would *not* result in improved safety or health for the newly covered employees inasmuch as, before the OSH Act, they would not have been protected by any mandatory safety or health standards. Kiewit responds that the Secretary was not authorized to modify a standard, only to refrain from adopting it.[12] But this assertion does not explain when it would be appropriate to not adopt an established Federal standard, if the standard continued to apply only in the industry for which it was originally promulgated. The anticipation that a standard would not improve safety, or that there may be "conflict among any such standards," *id.*, seems to require that an OSH standard's scope exceed that of its source standard. At a minimum, it is at least plausible "that established federal standards must be expanded to cover employees *in additional industries* unless application of the standards to the 'specifically designated employees' in that industry 'would not result in improved safety or health.'" OSHRC Decision at 1456–57 (Attwood, Comm'r, dissenting). Put differently, the new OSH standards could be extended to cover employees in a new industry if those employees were not already protected by an analogous, industry-specific standard. This seems a reasonable construction of the OSH Act but it does not

---

[12] Kiewit argued that section 6(a)'s exemption for standards not improving health or safety was intended to address national consensus standards. *See* Oral Argument at 26:50–27:06, 27:43–47 (Oct. 10, 2019). The text of the provision, however, draws no such distinction and plainly applies with like force to established Federal standards.

foreclose Kiewit's reading that the scope of an OSH standard promulgated under section 6(a) is tied by implication to the same industry as its source standard, even if the standard now extends to additional employers within that industry.[13] The plain language of the OSH Act does not reveal the extent to which the Secretary could expand the scope of section 6(a) standards without resorting to formal rulemaking under section 6(b). "[T]he fact that the provision can support two plausible interpretations renders it ambiguous for purposes of *Chevron* analysis." *AFL-CIO v. FEC*, 333 F.3d 168, 174 (D.C. Cir. 2003) (citing *United States v. Nofziger*, 878 F.2d 442, 446–47 (D.C. Cir. 1989)).

B.

"At *Chevron* step two, 'the question for the court is whether the agency's interpretation is based on a permissible construction of the statute in light of its language, structure, and purpose.'" *Nat'l Treasury Emps. Union v. FLRA*, 754 F.3d 1031, 1042 (D.C. Cir. 2014) (quoting *AFL-CIO v. Chao*, 409

---

[13] We agree with the Commission that the Secretary's reliance on OSH Act section 4(b)(2)—which provides that standards issued under preexisting labor laws are deemed OSH standards issued under both the OSH Act and the preexisting labor laws, until superseded by corresponding standards the Secretary deems more effective—is misplaced. *See* 29 U.S.C. § 653(b)(2); OSHRC Decision at 1451–1452, 1452 n.14. The legislative history indicates that section 4(b)(2) was intended "to insure that standards under existing laws will not be repealed" by the OSH Act's enactment and instead "remain effective until superseded by the promulgation of standards under section 6a" in order to "preserv[e] remedies available under existing laws." 116 Cong. Rec. 42,206 (1970) (statement of Rep. Steiger). Accordingly, section 4(b)(2) "has no bearing on whether section 6(a) authorized the Secretary to expand the scope of established federal standards to additional industries." OSHRC Decision at 1452. *But see* Sec'y's Br. 30 & n.7.

F.3d 377, 384 (D.C. Cir. 2005) (internal quotation marks and citations omitted)). And, as outlined *supra*, "[b]ecause the Commission's powers are solely adjudicatory," it too "must defer to the Secretary's reasonable interpretations." *S.G. Loewendick & Sons*, 70 F.3d at 1294. But, here, the Commission withheld deference based on its conclusion that the revocation of § 1910.5(e) was an arbitrary and capricious policy change and that the Secretary's interpretation of section 6(a) was unreasonable. OSHRC Decision at 1449–50. We address each argument in turn.

1.

The Commission found the revocation of § 1910.5(e) to be procedurally defective and, accordingly, the Secretary's interpretation embodied therein—that section 6(a) authorized the extension of established Federal standards to new industries—undeserving of *Chevron* deference. *See id.* at 1449 ("'[D]eference is not warranted,' however, 'where the regulation is "procedurally defective"—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation.'" (quoting *Encino Motorcars*, 136 S. Ct. at 2125)). The Commission's reliance on *Encino Motorcars* is misplaced. There, DOL issued a 1978 opinion letter departing from the position it had adopted eight years earlier in an interpretive regulation. 136 S. Ct. at 2123. Over the ensuing decades, DOL continued to affirm its 1978 interpretation and, in 2008, finally published a notice of proposed rulemaking to revise the 1970 regulation to accord with existing practice. *Id.* In 2011, however, "the Department changed course yet again" and "issu[ed] a final rule that took the opposite position from the proposed rule," abandoning the policy it had applied over the past thirty-plus years in favor of its original 1970 interpretation. *Id.* Critically, "[t]he Department gave little explanation for its decision to abandon its decades-old

practice," *id.*, and the "lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position" meant that the "regulation does not receive *Chevron* deference," *id.* at 2127. The lack of deference reflected more than DOL's faulty reasoning—indeed, the Supreme Court acknowledged DOL's "summary discussion may suffice in other circumstances." *Id.* at 2126. Rather, key to understanding *Encino Motorcars* is the Court's recognition that, under the circumstances, a cursory explanation was inadequate "in particular because of decades of industry reliance on the Department's prior policy." *Id.* In other words, the unexplained departure was especially egregious because DOL's reversal repudiated the position it had repeatedly affirmed to employers for over thirty years.

*Encino Motorcars* is readily distinguishable. First, the revocation of § 1910.5(e) in September 1971 did not implicate the same reliance concern. Unlike the "decades-old practice" at issue in *Encino Motorcars*, *id.* at 2123, § 1910.5(e) "existed for less than four months, was in effect for less than two weeks, and was never even published in the Code of Federal Regulations," OSHRC Decision at 1462 (Attwood, Comm'r, dissenting). Moreover, employers were on notice that changes to the newly promulgated regulations could occur without further rulemaking because the Secretary expressly retained his section 6(a) authority for two years and could "modify or revoke" any Part 1910 standard without notice and comment. 29 C.F.R. § 1910.4(b). And in the event of conflict between Part 1910 standards, necessary action—including modification or revocation—should be taken to eliminate the conflict "so as to assure the greatest protection of the safety or health of the affected employees." *Id.*

The plain tension between § 1910.5(c)(2) and § 1910.5(e)[14] manifests that § 1910.5(e)'s revocation was not a

---

[14] The Secretary also identifies a conflict between § 1910.5(e) and § 1910.11 but his argument is less convincing on this point. Section 1910.11 provides that "[t]he provisions of this Subpart B adopt and extend the applicability of, established Federal standards in effect on April 28, 1971, with respect to every employer, employee, and employment covered by the Act." 29 C.F.R. § 1910.11(a). Because § 1910.11 is itself codified in Subpart B, the Secretary contends it is made operative, by its own terms, to all established Federal standards, including Walsh-Healey standards, thereby extending such standards to every employer covered by the OSH Act. Better read, § 1910.11 indicates that the industry specific standards in Subpart B were not to retain the same coverage limitations as their source standards but were to apply to additional employers within the relevant industry. *Cf. Bechtel Power Corp.*, 4 BNA OSHC 1005, 1008 (No. 5064, 1976) (Secretary was authorized to extend, without resorting to formal rulemaking, coverage of CSA standards to construction-industry employers not subject to the CSA standards). The Walsh-Healey standards—which were not incorporated into Subpart B—would therefore be unaffected by § 1910.11 and would instead be subject to the general provisions set forth in Subpart A. That said, we are unpersuaded by Kiewit's contention that this purported conflict could not have caused § 1910.5(e)'s revocation because the Secretary did not also identify a conflict between § 1910.11 and the circumscribed scope provisions in Subpart B. *See, e.g.*, 29 C.F.R. § 1910.12 (CSA standards incorporated by reference from Part 1926 apply only to "construction work"). Despite maintaining work-based limitations, these scope provisions still extended coverage to employments not covered by the CSA standards. *See, e.g.*, *Bechtel Power Corp.*, 4 BNA OSHC at 1007 (construction manager subject to OSH standards even though CSA standards applied only to contractors and subcontractors). In contrast, § 1910.5(e) alone retained the restrictions of a preexisting statute, limiting Walsh-Healey derived standards to employment that would be subject to the Walsh-Healey Act if a federal contract were

"complete about-face," OSHRC Decision at 1449, but, instead, was carried out to "remove[] the anomaly created by the conflicting . . . provisions," *id.* at 1462 (Attwood, Comm'r, dissenting); *see also Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1335 (6th Cir. 1978) ("Given the wide variety of sources for the initial standards package and the rapidity of its promulgation, we would be frankly surprised if there were *not* anomalies.") (emphasis added). Section 1910.5(c)(1) explains the interplay between a "particular standard . . . applicable to a condition, practice, means, method, operation, or process" and a general industry standard, providing that the particular standard "shall prevail over any different general standard which might otherwise be applicable." 29 C.F.R. § 1910.5(c)(1). "On the other hand, any standard shall apply according to its terms to any employment and place of employment in *any industry*, even though particular standards are also prescribed for the industry, as in [S]ubpart B or [S]ubpart R of this part, to the extent that none of such particular standards applies." *Id.* § 1910.5(c)(2) (emphasis added). Subpart B encompasses the "particular standards" adopted for the construction industry. *See id.* § 1910.12. The import of this basic structure aligns with the Secretary's framing of his initial interpretation: the OSH Act authorized him to apply general standards (i.e., those derived from Walsh-Healey standards) to "any industry" unless that industry already had a particular standard addressing the same condition or hazard. *See Anthony Crane Rental, Inc. v. Reich*, 70 F.3d 1298, 1302 (D.C. Cir. 1995) ("Under this regulatory scheme, the general industry standards apply unless they are preempted by specific industry standards."). The limitation outlined in § 1910.5(e) plainly conflicts with § 1910.5(c) as a regime wherein general industry standards plug regulatory gaps would

---

involved. It does not seem inconsistent for the Secretary to identify a conflict in the latter situation but not the former.

be toothless if *only* CSA standards could apply to the construction industry.

It makes sense that the Secretary retained § 1910.5(c) at § 1910.5(e)'s expense given the OSH Act's express instruction that the Secretary favor more expansive protection. *See* 29 U.S.C. § 655(a) ("In the event of conflict among any such standards, the Secretary shall promulgate the standard which assures the greatest protection of the safety or health of the affected employees."). And the published notice, despite its brevity, reflects this purpose. *See* Applicability of Some Established Federal Standards, 36 Fed. Reg. at 18,081 (revocation intended "to remove the limitation to the application of the standards so that they may apply to every employment and place of employment exposed to the hazards covered by the standards."). These facts thus contrast sharply with those in *Encino Motorcars*, where employers were told a decades-long policy would be reflected in the revised regulation, only to have DOL inexplicably veer in the opposite direction. Ironically, despite the Commission's invocation of reliance interests, *its* decision, not the Secretary's, invalidates an interpretation that has stood for nearly fifty years.

Moreover, it is a troubling proposition to withhold deference based on the absence of formal rulemaking when, if the Secretary correctly construed the boundaries of his section 6(a) authority, it was proper for him to act without notice-and-comment procedures. The well-established principle of administrative law underpinning *Encino Motorcars* and the Commission's decision is that "where the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars*, 136 S. Ct. at 2125 (citing 5 U.S.C. § 706(2)(A)). Granted, "[e]xemptions from the terms of the Administrative Procedure Act are not lightly to be presumed,"

*Marcello v. Bonds*, 349 U.S. 302, 310 (1955), so we must ask "whether Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm," *Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998).

The OSH Act expressly exempted the Secretary from APA rulemaking, instructing him to promulgate OSH standards under section 6(a) "[w]ithout regard to chapter 5 of Title 5." 29 U.S.C. § 655(a); *see* OSHRC Decision at 1459 n.10 (Attwood, Comm'r, dissenting) ("Section 6(a) . . . is an unambiguous, comprehensive statement mandating that all rulemaking authorized thereunder is exempt from *all* APA requirements . . . ."). It is undisputed that, for two years, the Secretary could issue OSH standards using section 6(a)'s informal procedure. Indeed, Kiewit does not contest the validity of other section 6(a) standards, all of which were promulgated without notice and comment or reasoned explanation. The question, then, is whether the challenged standards were required to carry over their source standards' industry‑centric scopes. In answering, the Commission's view on the merits of the Secretary's position fused with its determination that his interpretation was procedurally defective, presuming the Secretary could *not* expand the scope of standards promulgated under section 6(a). This was improper because if, as the Secretary maintains, the standards could be applied to new industries—an interpretive question usually given deference—the Secretary cannot be faulted for bypassing procedures from which the Congress expressly exempted him.[15] For the same reasons, we reject Kiewit's

---

[15] We are skeptical of Kiewit's contention that section 6(a)'s express procedural exemption does not foreclose the Commission's reliance on *Encino Motorcars* because "the Commission never attributed its holding to the APA" and "[a]rbitrary and capricious action is also prohibited by the Due Process Clause . . . ." Kiewit Br.

contentions that deference is unwarranted because "OSHA is interpreting the OSH Act so as to limit the APA," Kiewit Br. 34, and that the APA's anti-supersession clause, 5 U.S.C. § 559, requires a narrow construction of section 6(a). Like the Commission, Kiewit looks past the OSH Act's express exemption from APA rulemaking and ignores the fact that if, as we conclude, section 6(a) authorized the Secretary to extend former Walsh-Healey standards beyond the manufacturing and supply industries, the usual rulemaking procedures were in fact displaced.

Kiewit's additional arguments against *Chevron's* application are unpersuasive. First, the "[c]ases applying *Chevron*-displacing rules," Kiewit Br. 31 n.9, are inapposite because, unlike this case, they implicate unique issues justifying departure from normal interpretive principles, including retroactivity, *see INS v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001) ("Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve." (citation omitted)), and Indian law, *see Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("[T]he standard principles of statutory construction do not have their usual force in cases involving Indian law."). Nor is *Chevron* displaced merely because the Commission and the Secretary disagree. Contrary to Kiewit's suggestion, we are not concerned that "the Executive speaks from both sides of its mouth, articulating no single position on which it might be held

30–31 (citation omitted). Even were we to ignore the explicit APA references elsewhere in the decision, *see, e.g.*, OSHRC Decision at 1451 ("Modification to APA Notice-and-Comment Process Not to Be Lightly Presumed."), it remains a stretch to conclude that the Commission tacitly employed a due process analysis in relying on *Encino Motorcars*, a decision that never mentions "due process."

accountable," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018), because only the Secretary's interpretation receives deference here. Finally, Kiewit argues that *Chevron* does not apply because § 1910.5(e)'s revocation "followed no formal process." Kiewit Br. 33 (citing *United States v. Mead Corp.*, 533 U.S. 218 (2001)). Kiewit again gives short shrift to section 6(a)'s express exemption from formal rulemaking; the logical extension of Kiewit's argument is that no interpretation embodied in a regulation promulgated under section 6(a) warrants *Chevron* deference. But Section 6(a) authorized the Secretary "to make rules carrying the force of law," *Mead*, 533 U.S. at 226–27, and the "interpretation claiming deference was promulgated in the exercise of that authority," *id.* at 227.

In sum, the Commission erred in withholding *Chevron* deference on account of purported procedural defects. We now address its determination that the Secretary's interpretation of section 6(a) is unreasonable.

## 2.

"[W]e must accept the [Secretary]'s interpretation if it is merely permissible." *Wagner Seed Co. v. Bush*, 946 F.2d 918, 925 (D.C. Cir. 1991). "We need not conclude that the [Secretary]'s interpretation of the [OSH Act] is 'the only one [he] permissibly could have adopted,' or 'even the interpretation deemed *most* reasonable by the courts.'" *Nat'l Treasury Emps. Union v. FLRA*, 754 F.3d 1031, 1042 (D.C. Cir. 2014) (citations omitted) (first quoting *Chevron*, 467 U.S. at 843 n.11; then quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009)). Here, the Secretary's interpretation of his authority under section 6(a) is not "[in]consistent with the terms of the statute and not unreasonable" and "therefore, entitled to our deference." *Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 360 (D.C. Cir. 2003).

First, we disagree that the Secretary's interpretation creates absurdities by condoning, for example, the application of "maritime or shipbuilding standards . . . to the manufacturing industry, or construction standards . . . to the agricultural industry." OSHRC Decision at 1451. This argument "reflects a fundamental misunderstanding of OSHA's regulatory scheme," which contemplates "that standards apply . . . wherever the working conditions and hazards addressed by the standard exist." Sec'y's Br. 32 n.8. A standard applied to a specialized line of work is, by its terms, unlikely to apply in a different setting where the same risk does not exist. For example, a standard addressing a danger found only in the agricultural industry will not apply to work in a manufacturing plant. But when the same hazardous condition—e.g., exposure to corrosive materials—exists in different industries, it is reasonable to apply a relevant standard across industry lines. And the likelihood of absurd results is further mitigated by the approach outlined in § 1910.5(c), which contemplates that general industry standards apply only if a specific industry standard does not already address the condition at issue.

True, cross-industry application may not be appropriate in all cases. The unique characteristics of an industry may make it infeasible for an employer to adopt a general standard, thereby requiring a different solution to abate the same hazard. Indeed, Kiewit asserts that applying the quick-drenching standard to construction poses feasibility problems—construction sites typically lack plumbing and frequent crew movement requires the relocation of portable water containers. But, in addition to the variance procedure set out in OSH Act section 6(d), 29 U.S.C. § 655(d),[16] if "strict compliance with a

---

[16] "Any affected employer may apply to the Secretary for a rule or order for a variance from a standard promulgated under [section

standard is physically impossible or would prevent performance of the work, employers may instead take alternative protective measures," *Am. Can Co.*, 10 BNA OSHC at 1310. And whether an employer has provided "suitable facilities for quick drenching," 29 C.F.R. § 1926.50(g), is judged on "the 'totality' of the relevant 'circumstances,' including the nature, strength, and amounts of the corrosive material . . . ; the configuration of the work area; and the distance between the area where the corrosive chemicals are used and the washing facilities," *Atl. Battery Co.*, 16 BNA OSHC 2131 (No. 90-1747, 1994). The Secretary thus cannot satisfy his burden to establish that facilities are unsuitable "merely by showing that the flushing apparatus is not an eyewash fountain." *P.J. Spillane Co.*, 24 BNA OSHC 1253, 1261 (No. 11-0380, 2012) (vacating citation issued to contractor for eyewash station comprised of hose and eyewash bottle). Tellingly, although the Commission recognizes an affirmative infeasibility defense, Kiewit has not alleged that it was in fact infeasible to provide suitable quick-drenching facilities here.

Kiewit next contends that extending the reach of standards issued under section 6(a) contravenes the procedural requirements the Congress prescribed for the promulgation of new construction standards. Its assertion that established Federal standards could not be made to apply to the

---

6]. . . . The Secretary shall issue such rule or order if he determines on the record, after opportunity for an inspection where appropriate and a hearing, that the proponent of the variance has demonstrated by a preponderance of the evidence that the conditions, practices, means, methods, operations, or processes used or proposed to be used by an employer will provide employment and places of employment to his employees which are as safe and healthful as those which would prevail if he complied with the standard." 29 U.S.C. § 655(d).

construction industry absent formal rulemaking procedures is based on language from the Conference Report, setting out the conferees' intent "that the Secretary develop health and safety standards for construction workers . . . pursuant to the provisions of [the CSA] and that he use the same mechanisms . . . for the development of health and safety standards for all the other construction workers newly covered by [the OSH] Act." H.R. Rep. No. 91-1765, at 33 (1970) (Conf. Rep.). But the implication that the Secretary could adopt only those construction standards issued under the CSA is at odds with the language of section 6(a), which authorizes the Secretary to promulgate "*any* national consensus standard, and *any* established Federal standard" as an OSH standard. 29 U.S.C. § 655(a) (emphases added). Indeed, under Kiewit's reading, the Secretary would have been unable to adopt any national consensus standards for the construction industry because such standards were not issued in accordance with CSA-mandated procedures. *See* OSHRC Decision at 1465 (Attwood, Comm'r, dissenting). This cannot be. Rather, the Conference Report's forward-looking language suggests the conferees were referring to the development of new construction standards, not the adoption of preexisting standards under section 6(a). A contrary interpretation would exert incredible tension on section 6(a)'s plain language.

Kiewit also claims the OSH Act's legislative history evinces congressional intent to preserve established Federal standards' industry-based limitations. It relies primarily on the Report of the Senate Committee on Labor and Public Welfare, which states that section 6(a) was designed "to establish as rapidly as possible national occupational safety and health standards *with which industry is familiar*." S. Rep. No. 91-1282, at 6 (emphasis added). That is, established Federal standards "have already been subjected to the procedural scrutiny mandated by the law under which they were issued."

*Id.* Therefore, as Kiewit sees it, the Secretary could not extend Walsh-Healey standards without rulemaking because the construction industry neither was familiar with those standards nor participated in their original promulgation. The Commission agreed, noting the construction industry would have "had no reason or incentive to participate in" the promulgation of the Walsh-Healey standards "because it was not affected by the rulemaking," and that "[d]epriving the construction industry of its 'opportunity to participate' in the rulemaking process is contrary to the OSH Act's language and intent." OSHRC Decision at 1450. This position is facially appealing but ultimately unavailing.

Despite the considerable ink spilled by the parties, the OSH Act's legislative history remains, at best, unilluminating. First, interested employers' participation is not dispositive. It is undisputed that the adoption of Walsh-Healey standards as OSH standards extended their protections to all manufacturers engaged in interstate commerce. However, the newly covered employers—those without federal contracts—were not subject to the Walsh-Healey Act and therefore had no more reason to participate in rulemaking than the construction industry. Granted, at least *some* manufacturers were interested and may have adequately represented the manufacturing industry at large but this was not a given. *Cf.* S. Rep. No. 91-1282, at 4 (before standards became mandatory for all employers, investing in health and safety often put smaller employers at "competitive disadvantage"). Many employers ended up subject to standards they had assumed would not apply, notwithstanding the standards went through "the procedural scrutiny mandated" by statute. *Id.* at 6. Thus, the construction industry's lack of participation in the promulgation of the Walsh-Healey standards does not, alone, affect the reasonableness of the Secretary's interpretation.

Second, although it makes sense that the Congress would not have intended industry to be blindsided by standards rapidly promulgated under section 6(a), it is not obvious that the standards had to have been scrutinized by each specific industry to which they were to apply or by industry in general. Indeed, the Senate Report directing that OSH standards be those "with which industry is familiar," *id.*, also recognized that "the chemical and physical hazards which characterize modern industry are not the problem of . . . a single industry," *id.* at 4, but instead are "truly a national concern," *id.*, that should be addressed through "uniformly applied" standards, *id.* at 1. It seems reasonable, then, for new OSH standards to cross industrial boundaries in order to abate the harms associated with materials that affect both manufacturing and construction workers. *See id.* at 3. And the OSH Act's drafters "were aware that the then recently-adopted Walsh-Healey standards would be the primary source of established federal standards for *industrial working conditions* covered by the Act." *Gen. Motors Corp.*, 9 BNA OSHC 1331, 1336 (No. 79-4478, 1981) (emphasis added). Indeed, the Secretary testified to the Senate Subcommittee on Labor that "the Walsh-Healey Public Contracts Act and its companion legislation" were "[t]he only Federal [safety and health] laws not confined to a specific industry." *Occupational Safety and Health Act, 1970: Hearings on S. 2193 and S. 2788 Before the Subcomm. on Labor of the S. Comm. on Labor & Public Welfare*, 91st Cong. 80 (1970) (statement of George P. Shultz, Secretary of Labor).

Our view of the legislative history is not altered by the fact that the House of Representatives rejected a bill proposed by Representative Dominick Daniels, providing that any established Federal standard promulgated as an OSH standard was "not limited to its present area of application," H.R. 16785, 91st Cong. § 6 (as reported by H. Comm. on Educ. & Labor, July 9, 1970), in favor of a substitute bill introduced by

Representative William Steiger, which contained no such language, *see* H.R. 19200, 91st Cong. (1970). The Commission deemed the adoption of the competing Steiger bill "as further proof that Congress never intended [Walsh-Healey] standards to apply to construction employers." OSHRC Decision at 1453. This conclusion is far too speculative. Even assuming "[t]he vote to substitute *was* a vote on the Daniels bill," Kiewit Br. 44 (citing *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 16 & n.23 (1980)), it is far less clear *why* the Daniels bill lost. There were many differences between the two bills, chief among them the "strike with pay" provision in the Daniels bill, which "encountered stiff opposition in the House." *Whirlpool Corp.*, 445 U.S. at 15. In contrast, the language setting the scope of established Federal standards was not mentioned during the floor debates. It is therefore an immense leap to derive from the Daniels bill's failure any intent to reject a single phrase in a bill laden with controversial provisions. We decline the invitation to make this jump.

Even after considering Kiewit's myriad arguments made in dogged pursuit of its petition,[17] whether the quick-drenching provision was properly extended to the construction industry remains a question with no obvious answer. It is apparent from our efforts to untangle the mare's nest that is the OSH Act and its implementing regulations that the Congress intended *some* scope expansion for standards adopted under section 6(a). *See* S. Rep. No. 91-1282, at 6 (established Federal standards "may be made applicable to additional employees who are not under the protection of such other Federal laws"). Otherwise, the new OSH standards would continue to cover only the limited swath of employers subject to preexisting labor laws. But this says nothing about *how far* the Secretary could extend established

---

[17] All arguments not expressly addressed have nevertheless been considered and rejected.

Federal standards without resorting to formal rulemaking. Did the Congress intend a section 6(a) standard to apply only to those employers that would have been covered under the preexisting standard if there were a federal contract, to all employers within the same industry, or to all employment where the condition or hazard exists? Our careful review of the OSH Act's less-than-pellucid legislative history and the Secretary's frequently muddled regulatory efforts has not clarified matters. "If Congressional intent is unclear after" analyzing the statute and relevant legislative history, "then the reviewing court is called upon to determine whether the agency's interpretation is 'permissible,' that is to say reasonable." *Inv. Co. Inst. v. Conover*, 790 F.2d 925, 932 (D.C. Cir. 1986).

Although it is plausible that the Congress intended standards adopted under section 6(a) to extend only to employers within the same industry as their source standard, the Secretary's interpretation is nevertheless a permissible construction of the OSH Act. "Step two of *Chevron* does not require the best interpretation, only a reasonable one." *Am. Forest & Paper Ass'n v. FERC*, 550 F.3d 1179, 1183 (D.C. Cir. 2008). Considering, among other factors, the OSH Act's stated purpose of expanding workplace protections "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b), and section 6(a)'s instruction that, "[i]n the event of conflict among any such standards, the Secretary shall promulgate the standard which assures the greatest protection of the safety or health of the affected employees," *id.* § 655(a), we find that the Secretary's interpretation is consistent with the OSH Act and is therefore entitled to *Chevron* deference. We do not reach the Secretary's arbitrary-and-capricious challenge because the Commission's failure to "afford proper deference to the Secretary's reasonable determination" necessitates that its

"ruling was not in accordance with the law" and must be set aside. *Sec'y of Labor v. Cranesville Aggregate Cos.*, 878 F.3d 25, 36 (2d Cir. 2017).

Accordingly, we grant the Secretary's petition for review and deny Kiewit's cross-petition, reverse the Commission's decision and remand for adjudication on the merits of Kiewit's citation.

*So ordered.*